# EXHIBIT A

# File & Servexpress

| HOME | FILING & SERVICE | ALERTS | SEARCH |
|------|------------------|--------|--------|

Case History　　Cases Search　　Daily Docket　　Transaction Status　　Advanced Search

Home > **Results**

**Case History Search**
Search Created:
10/21/2025 15:12:48 GMT-0400 (Eastern
Daylight Time)

Printable Version

| **Court:** | DE Court of Chancery Civil Action | **Judge:** | Cook, Nathan A | **File & ServeXpress Live Date:** | 9/19/2025 |
| **Division:** | N/A | **Case Number:** | 2025-1059-NAC | **Document(s) Filed:** | 12 |
| **Case Type:** | Breach of Contract | **Case Name:** | CLOSED 10-16-25/Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc. | **Date Range:** | All |

Choose an action: `-- Select --` [Go]　　Show `50` records

⬇ Export　　1-6 of 6 transactions　　<<Prev　Page 1 of 1　Next>>

| | Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | 77318225 | 10/16/2025 9:41 AM EDT | File And Serve | 2025-1059-NAC CLOSED 10-16-25/Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc. | Gaston Loomis, McElroy Deutsch Mulvaney & Carpenter LLP - NJ | 6 | ☐ | Notice | NOTICE OF FILING OF NOTICE OF REMOVAL, ON BEHALF OF DEFENDANT HAMILTON TECHNOLOGIES, INC. [view] • Linked to (1) | Accepted | 0.2MB |
| | | | | | | | ☐ | Exhibits | EXHIBIT A TO NOTICE OF FILING OF NOTICE OF REMOVAL [view] • Linked to (1) | Accepted | 3.4MB |
| | | | | | | | ☐ | Exhibits | EXHIBIT B TO NOTICE OF FILING OF NOTICE OF REMOVAL [view] • Linked to (1) | Accepted | 0.3MB |
| | | | | | | | ☐ | Certificate of Service | CERTIFICATE OF SERVICE TO NOTICE OF FILING OF | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | NOTICE OF REMOVAL [view]<br>• Linked to (1) | | |
| ☐ | 77314477 | 10/15/2025 3:36 PM EDT | File And Serve | 2025-1059-NAC CLOSED 10-16-25/Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc. | Gaston Loomis, McElroy Deutsch Mulvaney & Carpenter LLP - NJ | 5 | ☐ | Entry of Appearance | Entry of Appearance of Gaston P. Loomis as counsel for Defendant with Certificate of Service [view] | Accepted | 0.2MB |
| ☐ | 77199715 | 9/30/2025 11:54 AM EDT | File Only | 2025-1059-NAC CLOSED 10-16-25/Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc. | Leslie Spoltore, Obermayer Rebmann Maxwell and Hippel LLP - Philadelphia | 4 | ☐ | Summons | Summons directed to Hamilton Storage Technologies, Inc. with Affidavit of Service [view]<br>• Linked to (2) | Accepted | 2.0MB |
| ☐ | 77143452 | 9/23/2025 2:40 PM EDT | File And Serve | 2025-1059-NAC CLOSED 10-16-25/Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc. | Register in Chancery, DE Court of Chancery Civil Action | 3 | ☐ | Issuance of Summons | 9-23-25 Issued (1) original 3104 Summons (1) copy to Law Firm. [view]<br>• Linked from (1) | Accepted | 0.1MB |
| ☐ | 77138195 | 9/23/2025 9:48 AM EDT | File Only | 2025-1059-NAC CLOSED 10-16-25/Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc. | Leslie Spoltore, Obermayer Rebmann Maxwell and Hippel LLP - Philadelphia | 2 | ☐ | Summons Instructions | LETTER OF INSTRUCTION FOR SERVICE OF SUMMONS [view] | Accepted | 0.1MB |
| ☐ | 77116888 | 9/19/2025 11:37 AM EDT | File Only | 2025-1059-NAC CLOSED 10-16-25/Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc. | Leslie Spoltore, Obermayer Rebmann Maxwell and Hippel LLP - Philadelphia | 1 | ☐ | Complaint with 1 or 2 defendants | Complaint [view]<br>• Linked from (5) | Accepted | 0.3MB |
| | | | | | | | ☐ | Verification to Complaint | Verification of Jason Neat [view] | Accepted | 0.1MB |
| | | | | | | | ☐ | Exhibits | Exhibits A - D [view] | Accepted | 2.0MB |
| | | | | | | | ☐ | Supplemental Information Sheet | Supplemental Information Sheet | Accepted | 0.2MB |

[view]

1-6 of 6 transactions   <<Prev   Page 1 of 1   Next>>

**About File & ServeXpress** | **Resource Center** | **FAQs** | **Terms & Conditions** | **Privacy**

© 2025 File & ServeXpress, LLC. All rights reserved

**Client Support**

☎ 1-888-529-7587

✉ support@fileandserve.com

💬 Chat Online



**Supplemental Information Pursuant To Rule 3(b) of the Rules of the Court of Chancery**

EFiled: Sep 19 2025 11:17AM EDT
Transaction ID 77116888
Case No. 2025-1059-

The information contained herein is for use by the Court for statistical and administrative purposes. Nothing in this document shall be deemed binding for purposes of the merits of the case.

**Case Caption:** Eurofins Viracor BioPharma Service, LLC v. Hamilton Storage Technologies, Inc.
**Date Filed:** 09/19/2025
**Primary Case Type:** Breach of Contract
**Case Statement:** Fraudulent inducement, negligent misrepresentation, breach of warranties, unjust enrichment, and breach of contract.

**Counsel for Plaintiffs - Counsel Members**
**Obermayer Rebmann Maxwell and Hippel LLP - Philadelphia - Centre Square W 1500 Market St Ste 3400, Philadelphia, PA 19102**

| First Name | Last Name |
|---|---|
| Leslie | Spoltore |

**Subject Matter Jurisdiction - Relevant Statutes**

- 10 Del. C. § 341

ORIGINAL



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

Eurofins Viracor BioPharma Services, LLC,     :

                       Plaintiff,    :     C.A. No. 2025-1059-NAC

                                     :

          v.                      :

                                       :

Hamilton Storage Technologies, Inc.,         :

                                       :

                   Defendant.   :

                                       :

## THE STATE OF DELAWARE

## TO:    LESLIE SPOLTORE, ESQUIRE

## YOU ARE COMMANDED:

To summon the above-named defendant so that, within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon Leslie Spoltore, Esquire, Plaintiff's counsel, whose address is 123 S. Justison Street, Suite 100, Wilmington, Delaware 19801 an answer to the verified complaint.

To serve upon defendants a copy hereof and of the verified complaint.

TO THE ABOVE-NAMED DEFENDANT:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the verified complaint, judgment by default will be rendered against you for the relief demanded in the verified complaint.

Dated:       9-23-25

*Tamarah Burton*

Register in Chancery

C.A. # 2025-1059-NAC

Eurofins Viracor BioPharma Services,  :
LLC,                                   :
                          Plaintiff,  :
                                       :
              v.                       :
                                       :
Hamilton Storage Technologies, Inc.,  :
                                       :
                          Defendant.  :


**SUMMONS**

Please effectuate service upon:

>       Hamilton Storage Technologies, Inc.
>       c/o 3H Agent Services, Inc.
>       320 North Carson Street
>       Carson City, NV, 89701


pursuant to 10 *Del. C.* §3104.


SERVICE TO BE COMPLETED BY Counsel for Plaintiff.


/s/ *Leslie Spoltore*
Leslie B. Spoltore, Esquire (#3605)
*Counsel for Plaintiff*

Dated:  September 22, 2025

EFiled: Sep 19 2025 11:37AM EDT
Transaction ID 77116888
Case No. 2025-1059-

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| Eurofins Viracor BioPharma Services, LLC, | : | C.A. No. |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Hamilton Storage Technologies, Inc., | : | |
| | : | |
| Defendant. | : | |

**VERIFIED COMPLAINT**

## I. Introduction

1. Plaintiff, Eurofins Viracor BioPharma Services, LLC ("Eurofins") brings this Complaint as a result of a wholly inadequate solution for biological sample management, designed and installed by Hamilton Storage Technologies, Inc. ("Hamilton"), called the BiOS XL4 system (the "BiOS XL4" or the "Machine").

2. Instead of the promised, customized to Eurofins' needs, fully automated, state of the art system, Hamilton swindled Eurofins into purchasing a high-priced dud.

3. In reliance upon Hamilton's expertise, Eurofins paid $1.65 million for the BiOS XL4, which Hamilton recommended, specified and sold to address Eurofins' need for a storage and retrieval solution to manage approximately

500,000 test tubes containing biological samples at -80 degrees Celsius.

4.     Specifically, the BiOS XL4 has been operational less than 5% of the time since it was constructed by Hamilton at Eurofins' facility, it fails to maintain sample integrity, is riddled with technical glitches, provides none of the promised peak performance or automated capabilities, its refrigeration system is frequently unable to maintain the required ultra-low temperature to store biological samples, its robotic arm equipped with a scanner misidentifies and crushes precious biological samples, requiring constant supervision and troubleshooting, rendering the Machine totally unreliable, and a complete and utter fiasco.

5.     Further, Hamilton's promise of reduced maintenance and savings in labor cost due to the marketed walk-away functionality, proved to be illusory as Hamilton's own technician instructed Eurofins to only utilize the Machine under supervision, between the hours of 8:00 a.m. and 3:00 p.m. on weekdays, because its frequent malfunctions require constant technical intervention. Due to the abject failure of the BiOS XL4 to perform as promised, between October 2022 and July 2024, Eurofins lost in excess of $1.2 million in business opportunities for offering bio-sample storage, which was one of the main factors justifying the expense of purchasing the Machine.

## II.     Parties

6.     Eurofins is a Delaware limited liability company, with a registered

agent, Cogency Global Inc., located at 850 New Burton Road, Suite 201, Dover, Delaware.

7.     Hamilton is a corporation organized and existing under the laws of the State of Nevada, with a registered agent, 3H Agent Services, Inc., located at 320 North Carson Street, Carson City, Nevada, 89701.

### III.  Jurisdiction and Venue

8.     This Court has jurisdiction over this action pursuant to 10 *Del. C.* § 341, which give the Court of Chancery jurisdiction "to hear and determine all matters and causes in equity." This Court also has jurisdiction under the "clean-up" doctrine to the degree that any of the claims are deemed legal in nature.

9.  Hamilton is subject to the personal jurisdiction of this Court because, pursuant to Eurofins' Purchase Order and its Terms and Conditions of Purchase, Hamilton consented to the personal jurisdiction of the state and federal courts of Delaware. See Exhibit "A" at ¶20.2.

### IV.  Background Facts

### Eurofins Sought a Vendor To Design An Automated Bio-Repository

10.     Eurofins provides drug development solutions to pharmaceutical and research organizations, specializing in infectious disease, oncology, auto-immune, cell and gene therapy, molecular, allergy, and immunology testing.

11.     Its business operations require Eurofins to process and store

3

temperature -sensitive biological samples in high volumes.

12.    In an effort to expand its business and given the rapid increase for pharmaceutical testing at the height of the COVID-19 pandemic, Eurofins sought out a vendor who could provide a reliable solution to Eurofins' need to automate high-volume sample processing and storage at -80°C, without compromising the safety of the sensitive biological specimens.

13.    Eurofins narrowed down its interest to three vendors, including Hamilton, who offered made-to-order bio-repository storage, capable of scaling the system to meet Eurofins' demand.

14.    Eurofins was not looking to buy an off-the-shelf, pre-fabricated product. Instead, it impressed upon the vendors that Eurofins wanted a solution offering reduced maintenance and savings in labor costs and controlled and validated specimen tracking and inventory by replacing human laboratory workers with a robust automated system that can receive, process, store, track and retrieve samples around the clock.

15.    On January 14, 2020, Hamilton offered a customized version of its BiOS system as the solution to Eurofins' needs, representing it to be capable of automatically processing and storing labware ranging in size from 0.3 mL to 10 mL at -80°C and retrieving the stored samples by use of a single universal mechanical arm. Hamilton represented the BiOS system as one that would

4

maximize productivity through peak performance, while ensuring sample integrity.

16.    Hamilton's marketing presentation to Eurofins was customized to correspond to Eurofins' specified needs. In particular, prior to the January 14, 2020 presentation, Eurofins submitted labware samples to Hamilton, which Hamilton reviewed for compatibility with the BiOS system. In its presentation, Hamilton acknowledged that Eurofins used a variety of cryo vial types and represented that the vials submitted by Eurofins were compatible with the BiOS system.

17.    In addition to the marketing materials and product overview, on January 16, 2020, Hamilton also provided to Eurofins product specifications and a Customer System Data Sheet for the model BiOS XL4.

18.    Hamilton advised Eurofins that the model BiOS XL4 would fulfill Eurofins' needs because of its ability to store and manage a very large sample collection, between 1.4-10.4 million samples.

19.    The BiOS XL4 model measurements are 15'-11" tall by 14'-5.2" wide and 23'-3.5" in length. A representation of the BiOS XL4 that Hamilton proposed as a solution to Eurofins is attached as Exhibit "B."

20.    The Data Sheet for the BiOS XL4 model describes that the system features a -20°C automation compartment and modular -80°C chest freezer

5

compartments for storage. Further, the system includes an automated I/O station where multiple racks with samples can be loaded or retrieved simultaneously via the use of a carousel-style module, increasing the efficiency of automatic processing.

21.    Lastly, the BiOS XL4 includes a Gantry Robot, that was promised to automatically access, pick, reformat and identify samples within the freezer compartment, minimizing the sample's transit between storage and processing. The Gantry Robot features a side code bar reader ("SBR"), designed to scan and read 1D (linear) and 2D (two-dimensional) bar codes placed on the side of the tubes or the bottom of the tube, respectively.

22.    The SBR was a critical consideration for Eurofins because the tubes used by Eurofins contain two labels, one generated by Eurofins, and the other affixed by Eurofins' specimen supplier (e.g., collection site or sponsor). At all times, Eurofins informed Hamilton that its business model and its labware features required that the SBR be capable of accurately reading Eurofins' generated labels, while disregarding those of its specimen suppliers.

23.    Hamilton assured Eurofins that the BiOS XL4's SBR was capable of meeting Eurofins' needs, including scanning of the barcodes placed on the side of the tubes.

24.    Further, Eurofins expressed its reliance on Hamilton's promise that

6

the BiOS XL4's fully automated sample processing would reduce Eurofins' labor costs and increase processing volume at all times of the day. Specifically, Eurofins intended to reduce its reliance on laboratory technicians' manual sample processing, and instead benefit from the BiOS XL4's automated functions that were promised to allow for sample processing 24/7, without human supervision, while preserving sample integrity and safety.

### Eurofins Relied Upon Hamilton's Representations Regarding Capabilities and Expertise in Making its Purchase Decision

25.     Given the COVID-19 pandemic, time was of the essence to Eurofins; as such, Eurofins needed to know Hamilton had the manpower to expeditiously install the system in Eurofins' facility.

26.     On August 12, 2020, to induce Eurofins to accept Hamilton's proposed solution, Hamilton provided to Eurofins a Project Management plan, describing how it could complete the installation of its BiOS XL4 solution in a timely manner.

27.     The Project Management plan described respective roles and responsibilities for the site preparation and installation, and an overview of the schedule for the installation, and further explained the Site Acceptance Testing ("SAT"), all to induce Eurofins to make the purchase.

28.     Specifically, Hamilton represented that it would take twenty (20) weeks to complete mechanical, electrical, commissioning, and refrigeration

7

installation in preparation for the BiOS XL4, concluding with the SAT.

29.    The SAT was designed to test the system functionality and demonstrate that the BiOS XL4 was meeting the described technical specifications.

30.    The SAT was supposed to take four (4) weeks to complete.

31.    A successful SAT completion was a prerequisite to the commencement of the three-month on-site BiOS XL4 Implementation Support Service, whereby a Hamilton Product Specialist would provide daily operational and technical support to Eurofins so that the BiOS XL4 was fully integrated into Eurofins' operations.

32.    Further, the successful SAT completion marked the commencement of the BiOS XL4 warranty period.

33.    On December 20, 2020, the Parties held a meeting with their engineering and architectural team to discuss how to best scale and integrate the BiOS XL4 system on Eurofins' premises in Lenexa, Kansas. Hamilton's team, led by John Genereux, its Vice President, and Lisa Simmons, its Sales Manager, once again reiterated the system's capabilities and how it would fulfill Eurofins' needs.

34.    The Parties further discussed technical specifications, system requirements, and the details of installation. In a follow-up email communication

with Eurofins' management, Lisa Simmons represented that a firm installation schedule will be provided upon receipt of a purchase order from Eurofins.

35.    On April 26, 2021, Hamilton issued a written proposal for the BiOS XL4 system, Quotation Nr. 575/ XL4/500 K/4, (the "Proposal").

36.    On or about May 10, 2021, Eurofins issued a purchase order to Hamilton for the BiOS XL4 system along with a labware order (the "Purchase Order"). A true and correct copy of the Purchase Order is attached as Exhibit "C".

37.    The purchase price of the system was $1,650,789.12.

38.    The Purchase Order expressly stated that the BiOS XL4 needed to be delivered by January 1, 2022. Id.

39.    The Purchase Order incorporated by reference the Eurofins' Terms and Conditions of Purchase ("Eurofins' Terms and Conditions"). A true and correct copy of the Eurofins' Terms and Conditions is attached hereto as Exhibit "A."

40.    Pursuant to the Eurofins' Terms and Conditions, all disputes arising under the Parties' contract must be resolved exclusively in the state or federal courts in the State of Delaware. See ¶20, Exhibit "A."

41.    On or about May 12, 2021, Scott Mattivi for Eurofins signed Hamilton's Proposal, and John Genereux counter-signed it for Hamilton on May

9

13, 2021. The validity of Hamilton's Proposal specifically required receipt of the Purchase Order which was incorporated into the contract. A true and correct copy of the Proposal is attached as Exhibit "D."

42.     Eurofins invested in excess of $720,000 in capital improvements to design and build a specialized room to accommodate the BiOS XL4 at its premises. In particular, this specialized room included features like compressed air, upgraded electrical systems, a water cooling system, and a liquid nitrogen system, all of which were built to specifications provided by Hamilton that were required to accommodate the Machine.

## The BiOS XL4 Installation Was Delayed Significantly

43.     Soon thereafter, it became clear that Hamilton would be unable to deliver the Machine as promised. Specifically, the installation process encountered numerous delays and the BiOS XL4 was not delivered and installed at Eurofins' premises in Lenexa, Kansas, until December 2022 - nearly a year after the January 1, 2022 deadline. Even then, shortly after installation, the Machine was unable to maintain the required temperatures.

44.     Even though the BiOS XL4 was constructed at Eurofins' premises by December of 2022, Hamilton failed to conduct the SAT testing for an additional six months. As such, the BiOS XL4 sat idle at Eurofins' premises for an additional six months, awaiting Hamilton's SAT testing.

45.    After extensive communications between Eurofins' employees and Hamilton's project management technicians regarding the installation and SAT delays, in March 2023, Eurofins escalated its dissatisfaction with Hamilton's delay in completing the BiOS XL4 installation and Hamilton's poor project management to Hamilton's executives, including Mr. John Genereux, and demanded that Hamilton prioritize fulfilling their contractual obligation and complete the SAT by April 14, 2023, so that the Machine could be put to its intended use.

46.    On or about March 20, 2023, Hamilton responded that it "[was] extremely resource constrained" and had to do a "financial work stoppage." Hamilton sent a revised project schedule envisioning the SAT completion by May 10, 2023.

47.    Yet again, Hamilton failed to comply with its updated project schedule. On April 17, 2023, Hamilton disclosed that it was postponing the SAT due to "software issues that arose during testing."

### The SAT Revealed Significant Mechanical Issues With the BiOS XL4

48.    Finally, after months of delay, and based on Hamilton's SAT protocol V5, the SAT took place between June 12-15, 2023. However, the BiOS XL4 failed to meet all of the most crucial acceptance criteria under Hamilton's own testing protocol. Although Eurofins reluctantly accepted the system, it did

11

so on the condition that Hamilton would promptly address and resolve the instances where the BiOS XL4 failed to meet the criteria and that it would conduct further on-site testing.

49.    Specifically, the BiOS XL4 failed to satisfy the SAT testing, *inter alia*, in the following ways:

    a.    Section 2.7 Picking and Delivery of Tubes (Cherry Picking Throughput)

        i.    Entry error on June 13, 2023 while introducing tubes.

        ii.    The BiOS XL4 picker arm was not able to pick 200 tubes from one nest in the required time.

    b.    Section 2.13 Freezer Performance

        i. A leak in Powerpack #2 in Freezer #1, impacted the BiOS XL4' ability to reach the required -80°C temperature. Further, the SAT identified temperature loss in Freezer #2, necessitating Hamilton's engineer to conduct an additional investigation into the root cause of the issue. As such, the SAT was further postponed to a date after the Freezer #1 and Freezer #2 issues were resolved.

    c.    Section 2.14 Error Detection & Recovery – Cooling System Errors

        i. Given the fact that the SAT revealed issues with both Freezers' temperature maintenance, the cooling system could not be tested, and the SAT had to be postponed, yet again, until such issues were addressed.

    d.    Section 2.16 Emergency back-up power (Generator)

12

i. Rescheduled to the next pre-planned generator test.

## Even After Conditional SAT Acceptance, the BiOS XL4 Constantly Malfunctioned

50.    After the conditional acceptance of the SAT, Eurofins continued to experience a slew of issues with the Machine when testing its sample introduction and pulling functions.  As a precaution, due to the numerous failures in the operations of the Machine, Eurofins began testing the Machine using empty labware.

51.    The most frequent issues encountered included:

a.    The lid lift clam motors failed to get into the proper position to pull the tubes;

b.    The tube labels were sticking together, preventing the tubes from falling back into the rack spot, requiring the manual removal of the racks from the system and separation of tubes;

c.    Errors in reading barcodes lead to the rejection of full racks;

d.    Robotics' errors occurred when pulling a large number of racks consecutively;

e.    Inaccurate reading of the rack barcodes;

f.    Interior door sensor issues; and

g.    The top door did not close correctly, preventing the system from functioning.

13

52.     These issues rendered the system unusable sometimes for days at a time, involved extensive troubleshooting, and required manual intervention by Eurofins' employees taking them away from their other work duties.

53.     Importantly, during the test runs, Eurofins uncovered additional major defects, significantly limiting how Eurofins could use the Machine without compromising the safety of the stored and processed samples.

54.     For example, on July 20, 2023, the -20°C system automation compartment started experiencing a rise in temperature to -4°C. Hamilton's technician determined that the system's compressor valve, water valve, and suction strainer needed new parts, and additional refrigerant.

55.     In or around August 2023, Eurofins discovered that the picker arm was unable to pick both small, 0.5mL, and large, 10mL tubes because it was crushing the 0.5mL tubes while opening its picker claw to grab the 10mL tubes.

56.     Hamilton's investigation revealed that when opening the picker claw wider to handle the larger 10mL tubes, and then switching back to the smaller 0.5mL tubes, the picker claw would grasp the smaller tubes harder than it should, crushing them as a result.

57.     Thermo Fisher Scientific, the supplier of the 0.5mL tubes, completed an investigation of the tubes and confirmed that the tube construction was not the cause of the malfunction.

58.    Hamilton's product engineer, who arrived on-site on September 5, 2023, was tasked with creating a solution to the tube crushing issue. Despite making adjustments to the picker arm claw, the problem persisted, and Eurofins' tubes continued to be destroyed by the BiOS XL4.

59.    Finally, Hamilton advised Eurofins at the beginning of September 2023 to suspend the use of 0.5mL tubes until Hamilton could devise a software change that it hoped would resolve the problem.

60.    This failure was a major setback for Eurofins because its clients required Eurofins to process that particular combination of 0.5mL and 10mL samples, without compromising the safety of the biological material.

61.    Of note, the selection and processing of different size labware in a single module (both 0.5mL and 10mL tubes), which was critical to Eurofins' business operations, was not included in the SAT testing protocol by Hamilton, and therefore was not discovered during the SAT, and not immediately known to Eurofins until after Eurofins had conditionally accepted the BiOS XL4.

62.    This is because the SAT testing protocol, designed by Hamilton, failed to include the testing of the customized operational functions required by Eurofins, as would be appropriate in the situation, but instead, was a boilerplate protocol, limited in scope and insufficient to determine whether the Machine could operate for the required up-time.

63.    This inability to handle labware of multiple sizes without destroying them, was a material breach of Hamilton's express representation that the BiOS XL4's "picker is capable of processing multiple types of labware", that "a mixture of labware including wide variety of microtubes, cryovials, and blood tubes can be stored and sorted in the same tube picking module", that "BiOS systems ensure the greatest levels of sample integrity in an automated systems" and that "[Eurofins]" vials submitted for review are compatible with BiOS XL4 system."

## Even After Full SAT Completion, the BiOS XL4's Malfunctions Persisted

64.    On September 24, 2023, after the picker freezer repairs, and the refrigeration and cooling system repairs, Hamilton completed the unfinished portions of the SAT testing protocol.

65.    On or about the same time, the BiOS XL4 entered a warranty period (the "Warranty Period") which, based upon Hamilton's representations, covered preventative maintenance and occasional repairs.

66.    Instead, the entire Warranty Period was spent addressing various malfunctions preventing Eurofins from any meaningful use of the system.

67.    Moreover, on September 5, 2023, Hamilton's Product Engineer arrived on-site to fulfill the requirement to provide BiOS XL4 Implementation Support Services and ensure smooth integration of the Machine into Eurofins'

16

operations. However, given that the BiOS XL4's performance was riddled with mechanical, robotics, software, and refrigeration defects described below, Hamilton's Product Engineers' time was instead consumed with troubleshooting the Machine, rather than the training of Eurofins' personnel.

68.    Between October 2023 and September 2024, Eurofins observed persistent issues with racks getting stuck and requiring manual retrieval, the system becoming unusable after failed sample fetch deployment, the BiOS XL4's top door catching on insulation material and not closing properly, robotics motor issues, picker arm cable issues, system error messages, sensor malfunctions where the BiOS XL4 was unable to detect the location of cassettes with samples, and its performance was disrupted due to false alarms.

69.    Eurofins notified Hamilton of each malfunction, and its employees worked directly with Hamilton's technicians to address the malfunctions; however, the malfunctions continued to occur, compromising Eurofins' business operations.

70.    In particular, Eurofins lost revenues because it was not able to offer bio-sample processing and storage to its clients because the Machine was destroying the glassware.    Additionally, Eurofins had to devote significant resources to the maintenance and troubleshooting of the BiOS XL4.

71.    As a result of these constant failures of the Machine, as of November

17

2023, Eurofins was only using the BiOS XL4 for a limited number of samples (approximately 1,000), out of fear that the precious samples would be spoiled or destroyed due the malfunction of the BiOS XL4. Of note, Eurofins required storage for approximately 500,000 tubes.

72.     On or about December 12, 2023, Eurofins reported to Hamilton that the BiOS XL4 started registering a rise in temperature inside its -20°C system automation compartment, showing readings at -8° C instead. Hamilton's mechanical vendor determined that the Machine's compressor failed and required part replacement. The BiOS XL4 was out of commission for another month because the repairs were not completed until January 24, 2024. This was the second time within six months that the -20°C system automation compartment experienced compressor malfunctions.

73.     Additionally, despite assurances that the BiOS XL4 system would read Eurofins' tube labels while disregarding third-party labels, in or about May 2024, Eurofins discovered that the SBR was unable to properly identify and read the Eurofins' labels.

74.     Instead of fixing the problem with the tube labels, Hamilton's technician advised Eurofins on or about May 7, 2024, to "temporarily work with labware that doesn't require a side barcode reader."

75.     The failure of BiOS XL4 to properly read the labels on the tubes

18

created a major setback for Eurofins because, without proper identification of the samples, the BiOS XL4 was unable to select and process the designated batches of samples, rendering the system useless.    To date, Hamilton has failed to implement a solution to this SBR defect.

76.    Because Eurofins could not rely on the BiOS XL4 to maintain the integrity of the samples, Eurofins pulled all clients' specimens from the Machine in or about May/June 2024, leaving in the Machine only a limited supply of the 2mL tubes.

77.    Further, even though Eurofins met the specifications for a pressurized dry air system, the labware started experiencing moisture and frosting issues, causing the labels to stick together, further impeding sample identification.

78.    Contrary to Hamilton's representation that the BiOS XL4 can process orders at all times of day or night while minimizing downtime and freeing employee resources, Hamilton's on-site technician instructed Eurofins in July of 2024 to only utilize the system under supervision, between the hours of 8:00 a.m. and 3:00 p.m. on weekdays because it encountered so many frequent errors and constantly required user intervention.

### Unresolved Issues With the BiOS XL4 Made Eurofins Lose Confidence In The Machine

79.    Following the SAT completion, between October 3, 2023 and

19

September 2024, the BiOS XL4 was fully operational less than 5% of the time.

80.     Despite having a business need for storing approximately 500,000 samples, given the abject unreliability of the Machine, Eurofins has never been able to store more than 10,000 samples for a limited time period.

81.     Between October 3, 2023 and September 2024, Eurofins complained to Hamilton about each malfunction encountered by the BiOS XL4 system, and its technical staff worked directly with Hamilton's technicians in a good faith effort to address the malfunctions; however, Hamilton was unable to fix the Machine.

82.     Dissatisfied with the deplorable performance of the Machine, on or about October 2, 2024, Eurofins sent a letter to Hamilton's management, advising that the BiOS XL4 never worked as promised, and requested a one (1) year extension of the warranty.

83.     In particular, Eurofins pointed out that the installation of the system was severely delayed, and when the BiOS XL4 was finally on premises, it was incompatible for use with the $35,000 worth of labware manufactured by Hamilton for Eurofins' use in the BiOS XL4.

84.     Despite this notice, Hamilton failed to remedy the defects in the operation of the BiOS XL4.

85.     Due to the persistent failures of the BiOS XL4 as described above,

Eurofins lost faith in the Machine's ability to safely process and store precious samples, and in Hamilton's ability to bring the Machine up to the standards necessary to fulfill the promises made by Hamilton to induce Eurofins to purchase the Machine. As such, Eurofins removed all its clients' specimens from the BiOS XL4 in or about December 2024, and no longer uses the Machine.

## COUNT I– FRAUDULENT INDUCEMENT

86.    Eurofins incorporates by reference and reasserts all factual allegations from the preceding paragraphs as though fully set forth herein.

87.    Hamilton knew the representations it made regarding the capabilities of its solution were false when made, and Hamilton intended those misrepresentations to induce Eurofins to select Hamilton as the solution provider and purchase the BiOS XL4 system.

88.    Specifically, during its initial product presentations and meetings with Eurofins on or about January 14, 2020, August 12, 2020, December 20, 2020, and in marketing materials and product specifications sent to Eurofins on or about January 16, 2020, April 14, 2020, August 12, 2020, December 2020, and April 26, 2021, Hamilton's executives, including but not limited to John Generaux, Michael Girardi, Lisa Simmons, and Matt Hutnak, misrepresented to Eurofins, *inter alia,* that:

a. The BiOS XL4's installation and the SAT testing would be completed

21

within 6 months from placing the Purchase Order, when in fact, Hamilton took 19 months to install the Machine, and an additional six months to begin SAT testing;

b. The BiOS XL4's sidebar code reader would read Eurofins' labels placed on the side of the tube and disregard any third-party labels, when in reality, the SBR cannot distinguish between the labels on the tubes;

c. The BiOS XL4 would process orders at all times, day or night, when in reality, Hamilton's own on-site technician instructed Eurofins' personnel to only utilize the BiOS XL4 under supervision between the hours of 8:00 a.m. and 3:00 p.m. on weekdays because of its frequent malfunctions, which required user intervention;

d. The BiOS XL4 would process multiple types of labware without mechanical changes or additional picking modules, when in reality, the BiOS XL4's picker arm is incapable of handling tubes of various sizes because it crushes 0.5mL tubes when also handling 10mL tubes in the same job.

89.   Hamilton either knew these representations were untrue when made or made these representations with reckless indifference to the truth.

90.   The subject of the fraudulent representations was about matters peculiarly within Hamilton's knowledge as the manufacturer of the BiOS XL4 system.

91.   Hamilton made these fraudulent representations before the Parties

22

entered into contractual obligations in order to induce Eurofins to purchase the BiOS XL4.

92.    Eurofins reasonably relied on Hamilton's false representations and warranties and in reliance on such representations made the decision to purchase the BiOS XL4.

93.    As a direct and proximate result of Hamilton's fraudulent representation and Eurofins' reliance thereon, Eurofins has been materially damaged in an amount to be determined at trial.

## COUNT II– NEGLIGENT MISREPRESENTATION

94.    Eurofins incorporates by reference and reasserts all factual allegations from the preceding paragraphs as though fully set forth herein.

95.    Hamilton, in the course of its business dealings with Eurofins, had a pecuniary duty to provide accurate information to Eurofins regarding the BiOS XL4's functionality, performance and specifications because it knew Eurofins would rely on such functionality, performance and specifications regarding the BiOS XL4's capabilities when considering to purchase the system from Hamilton, and because Hamilton had a direct financial interest in the outcome of the transaction.

96.    Hamilton, during product presentations and pre-contractual negotiations, made misrepresentations to Eurofins of material facts concerning

the functionality of the BiOS XL4.

97.   Hamilton's misrepresentations were, in fact, false.

98.   The subject of the false representations was about matters peculiarly within Hamilton's knowledge as the manufacturer of the BiOS XL4 system.

99.   Hamilton was negligent when it made those misrepresentations.

100.  Eurofins did not know that Hamilton's representations were false and reasonably believed them to be true.

101.  Eurofins reasonably relied on Hamilton's misrepresentations as the expert on the BiOS XL4 system and had no means of independently verifying the truthfulness of Hamilton's representations regarding the Machine's functionality because such information was not within public knowledge but rather was confidential trade and business information.

102.  In justifiable reliance upon Hamilton's negligent misrepresentation, Eurofins was induced to purchase the BiOS XL4.

103.  As a direct and proximate result of Hamilton's misrepresentations and Eurofins' reliance thereon, Eurofins has been materially damaged in an amount to be determined at trial.

## COUNT III - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

104.  Eurofins incorporates by reference and reasserts all factual allegations from the preceding paragraphs as though fully set forth herein.

105.  Hamilton is a merchant with respect to the BiOS XL4 system because it offers for sale automated bio-repository systems, including the BiOS XL4 system.

106.  Eurofins purchased the BiOS XL4 system from Hamilton in or about May 2021 and the Machine was installed at Eurofins' premises in Lenexa, Kansas in December 2022.

107.  An implied warranty that the BiOS XL4 system was merchantable arose by operation of law as part of the sale transaction between the Parties.

108.  Hamilton breached the implied warranty of merchantability in that the BiOS XL4 was not in a merchantable condition when sold or at any time thereafter and was not fit for the ordinary purposes for which such system is used.

109.  Further, the basic functions of the system were impeded by the system going off-line, encountering technical, mechanical, robotics and software issues resulting in the Machine being fully operational less than 5% of the time it has been in Eurofins' possession.

110.  Eurofins notified Hamilton of the discovered defects in writing hours after each instance of malfunction, requesting assistance and repairs, and on October 2, 2024; however, Hamilton was unable to conclusively address the issues.

111.  As a result of Hamilton's breach of the implied warranty of

merchantability, Eurofins has suffered damages in an amount to be determined at trial.

112.    Further, Hamilton's breach also caused the following incidental and consequential damages to Eurofins in that Eurofins lost business opportunities on offering bio-repository services to its vendors and had to incur additional significant labor costs each time employees had to abandon their tasks and attend to the malfunctioning Machine.

## COUNT IV – BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE

113.    Eurofins incorporates by reference and reasserts all factual allegations from the preceding paragraphs as though fully set forth herein.

114.    Eurofins purchased the BiOS XL4 system from Hamilton in or about May 2021 and the Machine was installed at Eurofins' premises in Lenexa, Kansas in December 2022.

115.    At all times prior to making the decision to purchase the BiOS XL4 system, Eurofins informed Hamilton that it was looking for a vendor that could provide a business solution for its needs for an automated bio-repository.

116.    Eurofins relied on Hamilton's skill and judgment to furnish a suitable bio-repository system to meet Eurofins' disclosed purposes.

117.    Hamilton knew or had reason to know that Eurofins was relying on Hamilton's skill and judgment to select and purchase the BiOS XL4.

26

118.    As a result of the circumstances of the sale, an implied warranty arose that the goods were fit for a particular purpose.

119.    The BiOS XL4 system was not fit for Eurofins' particular purpose because it did not perform according to specifications, nor did it satisfy Eurofins' disclosed needs.

120.    Eurofins notified Hamilton in writing of the defects in the system after each encountered issue, requesting assistance and repairs, and on October 2, 2024; however, Hamilton was unable to conclusively address the issues.

121.    As a result of Hamilton's breach of the implied warranty of fitness for a particular purpose, Eurofins has suffered damages in an amount to be determined at trial.

122.    Further, Hamilton's breach also caused the following incidental and consequential damages to Eurofins in that Eurofins lost business opportunities on offering bio-repository services to its vendors, and had to incur additional significant labor costs each time employees had to abandon their tasks and attend to the malfunctioning Machine.

## COUNT V – BREACH OF EXPRESS WARRANTY

123.    Eurofins incorporates by reference and reasserts all factual allegations from the preceding paragraphs as though fully set forth herein.

124.    Eurofins purchased the BiOS XL4 system from Hamilton in or about

May 2021 and the Machine was installed at Eurofins' premises in Lenexa, Kansas in December 2022.

125.    In connection with the sale of BiOS XL4 system, Hamilton provided an express warranty by affirmation of fact or promise or description of the services its BiOS XL4 system was supposed to be capable of performing.

126.    Specifically, Hamilton warranted the BiOS XL4 system is capable of, *inter alia*, processing multiple types of labware, picking individual tubes, reading Eurofins' barcodes placed on the side of the tube, and processing the samples automatically at all times of the day and night.

127.    Further, under Eurofins' Purchase Order, including its Terms and Conditions of Purchase, Hamilton provided an express Warranty of Conformity, guaranteeing that the BiOS XL4 conforms to Hamilton's specifications, designs, samples, description, and is free from defects, and is fit and suitable for the purpose intended, and manufactured according to the state of the art as applicable at the time of Order. See Exhibit "A" and "C."

128.    In the alternative, Hamilton's Proposal provided an express limited warranty for replacement or repair of defective parts in the BiOS XL4. See Exhibit "D."

129.    Hamilton breached the express warranties in that the BiOS XL4 system experienced persistent malfunctions.

28

130.   As a direct and proximate result of Hamilton's failure to fulfill its obligations under the express warranty, Eurofins has suffered damages in an amount to be determined at trial.

131.   Further, Hamilton's breach also caused the following incidental and consequential damages to Eurofins in that Eurofins lost business opportunities on offering bio-repository services to its vendors and had to incur additional significant labor costs each time employees had to abandon their tasks and attend to the malfunctioning Machine.

## COUNT VI – BREACH OF CONTRACT

132.   Eurofins incorporates by reference and reasserts all factual allegations from the preceding paragraphs as though fully set forth herein.

133.   Eurofins and Hamilton are Parties to a contract for the BiOS XL4, which is a valid and binding contract between the Parties, created through the Parties' conduct and performance, including Hamilton's April 26, 2021 Proposal, and Eurofins' Purchase Order with its Terms and Conditions of Purchase, dated May 10, 2021 (collectively, the "Contract").

134.   Eurofins has performed in full under the Contract by paying the purchase price for the BiOS XL4.

135.   As set forth herein and as will be shown by further discovery, Hamilton has breached the Contract, specifically because it has failed to provide a BiOS XL4

29

that performs as specified in the Contract.

136.   As a direct and proximate result of Hamilton's breach of its obligations under the Contract, Eurofins has been materially damaged, in an amount to be determined at trial.

## COUNT VII – UNJUST ENRICHMENT

137.   Eurofins incorporates by reference and reasserts all factual allegations from the preceding paragraphs as though fully set forth herein.

138.   Hamilton has been unjustly enriched, at the expense of Eurofins, in that it received and retained the full purchase price of the BiOS XL4 system in the amount of $1,650,789.12; however, it sold to Eurofins a useless Machine that does not perform as specified and has no value.

139.   As such, Hamilton has been unjustly enriched at the expense and to the detriment of Eurofins.

140.   As a direct and proximate result of Hamilton's unjust enrichment, Eurofins has been materially damaged, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Eurofins Viracor BioPharma Services, LLC prays for judgment and seeks relief against Defendant, Hamilton Storage Technologies, Inc., for:

(a)   Recission of the contract;

30

(b)     All legal and equitable damages allowed by law, including but

        not limited to compensatory, consequential and incidental

        damages and the removal of the BiOS XL4 and return of the

        premises to the pre-installation condition;

(c)     Pre-judgment interest and post-judgment interest as applicable;

(d)     An award of its attorneys' fees;

(e)     Rescission damages;

(f)     Costs and expenses of this action; and

(g)     Such other and further relief as the Court may deem just and

        proper.


                    Respectfully submitted,

                    Obermayer Rebmann Maxwell & Hippel LLP

                    /s/ *Leslie Spoltore*
                    Leslie B. Spoltore, Esq.  (#3605)
                    123 S. Justison Street, Suite 100
                    Wilmington, DE 19801
                    Leslie.Spoltore@obermayer.com
                    (302) 274-3062
                    *Counsel for Plaintiff*

Dated: September 19, 2025

EFiled: Sep 19 2025 11:37AM EDT
Transaction ID 77116888
Case No. 2025-1059-

## VERIFICATION

I, _JASON NEM_ , the _President_ , of Eurofins Viracor

BioPharma Services, LLC, having been duly sworn, do hereby depose and say that:

(i) I am authorized to make this Verification on behalf of Plaintiff Eurofins Viracor

BioPharma Services, LLC; (ii) I have read the Complaint and; (iii) the statements

made therein are true and correct to the best of my knowledge, information, and

belief.

19 Sept 25

SWORN TO AND SUBSCRIBED before me
this _19_ day of _September_ , 2025.



Notary Public
My commission expires:
8/31/29

NANCY EVEREST
My Appointment Expires
8/31/29

EFiled: Sep 19 2025 11:37AM EDT
Transaction ID 77116888
Case No. 2025-1059-

# EXHIBIT "A"

## GENERAL TERMS AND CONDITIONS OF PURCHASE

### A.
### General

**1.    Scope**

1.1.    These general terms and conditions of purchase (the "**GTP**") govern the contractual relationships between:
- Eurofins NSC US, Inc., duly incorporated and validly existing under the law of the State of Delaware, having its registered office at 343 West Main Street, Leola, PA 17540 ("**Eurofins**"); and
- its suppliers and/or service providers (individually the "**Supplier**"), who become active in the context of their commercial activity. (Eurofins and Supplier, individually the "**Party**" and jointly the "**Parties**")

1.2.    This section A of the GTP applies (i) to any and all purchase of goods and/or equipment (the "**Products**") from the Supplier by Eurofins and/or (ii) to any and all provision of services (the "**Services**") by the Supplier to Eurofins and/ or (iii) to any and all licensing of software (the "**Software**") (the Services, Products and Software being hereafter defined as the "**Articles**").

1.3.    Sections B, C and D of this GTP provide specifications for the purchase of Products, the provision of Services, the licensing or provision of Software Articles.

**2.    Essential conditions / Conclusion**

2.1.    These GTP are incorporated into and made an essential part of every contractual relationship between Eurofins and the Supplier regarding Articles (the "**Agreement**").

2.2.    An Agreement may be created by either of the following methods:

2.2.1.    Eurofins may issue an order to the Supplier, setting out Eurofins' requirements and any other documents or frame-agreements specified in the order (the "**Order**"). The Agreement is made, and the Order shall become binding upon (i) the acceptance by the Supplier (either verbally, in writing, or by electronic order confirmation) or (ii) on provision of Services, and/or (iii) the supply of the Products and/or (iv) supply of Software, whichever is the earlier point in time.

2.2.2.    Alternatively, the Supplier may issue written offer, proposal or quotation regarding the Articles (the "**Offer**"). The Agreement is made upon the acceptance by Eurofins of Supplier's Offer. Eurofins' acceptance shall be in writing and can take the form of: (i) a purchase order signed by Eurofins, (ii) a quotation accepted in writing by Eurofins, or (iii) a contract signed by a representative of Eurofins. For the avoidance of doubt, no work shall be commenced until an offer of the Supplier is expressively accepted in writing by Eurofins.

2.3.    General terms and conditions of business of the Supplier shall not apply nor shall they form part of the Agreement. A notice of objection regarding such general terms and conditions of the Supplier is herewith given. They shall only apply where so stipulated in the respective Agreement. Eurofins' failure to object to conflicting, contrary or additional terms and conditions shall not be deemed as an acceptance by Eurofins of such terms and conditions or a waiver of the provisions hereof. The terms of this GTP shall control in the event of any inconsistency in any Agreement or document referred to or incorporated therein, or any terms provided by Supplier. The terms of this GTP may not be supplemented, amended, modified or otherwise changed except in writing and executed by all parties. Delivery of Products, provision of Services, or supply of Software constitutes Supplier's acceptance of all terms and conditions in this GTP.

**3.    Information**

3.1.    The Supplier shall notify Eurofins if any of the instructions or information contained in the Order or the Offer, including these GTP, do not comply with applicable federal, state, provincial and local laws and regulations, or do not conform to the best practices in the industrial area (the "**Information**").

3.2.    All Information shall have been provided to Eurofins by the Supplier on the date of the Agreement or at such alternative date as may be agreed to by Eurofins in writing. In the event that Supplier fails to provide any necessary or relevant Information and such failure results in material damages to Eurofins, Eurofins will be entitled to terminate any Agreement immediately and without penalty and seek all available remedies, at law or in equity.

**4.    Duration**

4.1.    Agreements may:

- provide for performance successively or in instalments (the "Successive Performance Agreements").
4.2. Successive Performance Agreements with a fixed term period may be prolonged by mutual agreement of the Parties.

## 5. Price / Invoicing / Payment

### 5.1. *Prices and price adjustment*

5.1.1. Prices are fixed prices excluding any federal, state, provincial, local or foreign sales, use, value added, goods and services, or other similar taxes.

5.1.2. No cost can be charged to Eurofins for quotations, samples, trial shipments and specimen materials.

5.1.3. Prices shall include all costs in relation with the execution of the Agreement as well as any applicable taxes and/or duties and cover payment for all deliveries and services assigned to the Supplier (including notably the costs of preparing and packaging for shipment and the shipment costs).

5.1.4. Any additional costs of whatever nature require the prior written consent of Eurofins.

5.1.5. No advance payment will be made by Eurofins.

5.1.6. Where the total price of the Articles depends on time spent by the Supplier, the Supplier will offer its Articles under the form of either a non-revisable all-inclusive price or of a maximum number of hours or units at a non-revisable hourly rate or unit rate.

5.1.7. Without prejudice to the previous provisions, Eurofins shall immediately benefit from any price reduction implemented by the Supplier prior to the date of delivery of the Article.

5.1.8. If at any time during the Agreement, it comes to Eurofins' attention that a lower (contracted or non-contracted) price was or is being charged by the Supplier, its affiliates or by any company related/associated to the Supplier worldwide, to any company related/associated to Eurofins or any Company acquired by Eurofins, for a similar or identical Article under similar or identical circumstances, the lower price will also apply to Eurofins. The Supplier, following receipt of the notification of such lower price from Eurofins, will (i) apply the lowest price to both Eurofins and such affiliate within ten (10) business days; and (ii) credit Eurofins and its affiliate the difference paid between the higher price and the lowest price required, post-acquisition pursuant to this provision.

5.1.9. Upon Eurofins' request, Supplier will provide an itemized report of all items purchased by Eurofins, i.e., historical sales with part number, item description, unit of measure, price per unit of measure, quantity purchased, manufacturer name and part number if distributed, in an Excel or compressed file format.

5.1.10. Upon Eurofins request, supplier will cooperate with Eurofins to provide a business review on a periodic basis and will provide escalation contacts (both email and telephone) to be utilized to assist with issues, notification, prioritization and other tasks as needed. Such information will be updated and kept current as appropriate.

5.1.11. Eurofins shall not be liable for any additional payment for variations of work to be done or Articles supplied in excess without a written request from Eurofins. Before an additional payment can be made, a complementary quotation or variation approved in writing by an authorized representative of Eurofins must be obtained by Supplier.

5.1.12. No payment shall constitute any admission by Eurofins as to proper performance by the Supplier of its obligations under the Agreement.

5.1.13. Without prejudice to other provisions of the GTP or the Agreement, changes of price, fees or rates as well as any change in the terms of payment (the "**Change**") shall only apply to Successive Performance Agreements as of the first of January of each year (the "**Effective Date**") provided that:
- the Supplier had informed Eurofins of the proposed Change at least three (3) months prior to the Effective Date; and
- if Eurofins agreed to the Change prior to the Effective Date.

### 5.2. **Invoices**

5.2.1. All invoices must be sent to Eurofins at the email address specified in the Agreement, except as otherwise indicated in writing by Eurofins. Supplier shall follow Eurofins US and Canada General Invoicing Instructions provided to Supplier. Eurofins' preferred payment method is by ACH transfer or Virtual Card and Supplier shall complete such registration with Eurofins' payment systems in order to facilitate such payments.

5.2.2. Unless otherwise agreed, invoices shall not be rendered by the Supplier until delivery of the Articles which are the subject of the Agreement. Eurofins will not be responsible for any costs related to software subscriptions, licenses, or other services until the implementation is successfully completed.

5.2.3. Each invoice will, at minimum, include an invoice number, invoice date, Supplier's remittance address, offer/order number, Eurofins PO number, description of the Products/Services/Software, quantity, unit price, total price, Eurofins' full name, Eurofins' Vendor ID number and the Fed ID number of the Supplier, if any, along with any applicable tax identification number of the Supplier.

5.2.4. The Supplier acknowledges that invoices without PO number cannot be processed by Eurofins and will not be considered a valid invoice.

5.2.5. Supplier shall not include or add charges to any invoice without the prior written approval by Eurofins. In the case of any discrepancy, Supplier will issue Eurofins a credit note. If invoiced price is higher than agreed pricing, supplier will issue a price adjustment.

5.3. **Payment**.

5.3.1. Payment of all undisputed amounts shall be made within ninety (90) days after receipt of an acceptable invoice from Supplier (pursuant to Section A.5.2 above).

5.3.2. Eurofins' records will constitute sufficient proof of such payment unless the Supplier is able to provide evidence to the contrary.

5.3.3. The Supplier hereby accepts that Eurofins may offset any sums due from the Supplier to Eurofins or to its affiliates against any sums Eurofins owes to the Supplier.

5.3.4. Eurofins may also withhold any sums owed by Eurofins to the Supplier if Eurofins or its affiliates has another claim against the Supplier, without such claim having to be related to the Agreement or the sums owed.

5.3.5. If permitted under applicable law, Eurofins shall have no obligation to pay any invoice received more than one (1) year after delivery of the Articles or completion of the Services. It is the supplier's responsibility to collect the sales taxes from Eurofins at the time of the sale and then remit the tax to the appropriate government agency. Eurofins shall have no obligation to pay any invoice rebill for the purpose of collecting sales tax if rebill is received more than one (1) year after delivery of the articles or completion of services.

5.4. **Payment Disputes**.

5.4.1. If Eurofins has a good faith dispute regarding any amount due on an invoice, Eurofins shall pay the amount not in dispute and may withhold the disputed amount pending resolution. No dispute shall be considered a "good faith" dispute unless Eurofins provides written notice of the dispute to Provider, giving reasonable detail as to the basis of the dispute. Provider and Eurofins shall use their good faith efforts to promptly resolve all such disputes. The parties shall seek to resolve any disputes expeditiously and in good faith, and Supplier shall continue to perform it obligations during any such dispute.

5.4.2. Supplier shall notify Eurofins in the event of any overpayment to Supplier (whether due to a duplicate charge, price or invoice mistake, or any other reason), and shall, within thirty (30) days, provide, at Eurofins discretion, either an invoice credit or a refund to Eurofins for the amount of such overpayment.

## 6. Delivery

6.1. The Articles shall be delivered or, in case of Services, performed on the date written in the Agreement (the "**Delivery Date**"). Agreed dates and deadlines are binding. Time is of the essence. When it comes to determining whether deliveries and services have been made or provided in a timely manner, the decisive point in time shall be the actual provision of the Articles. Changes to agreed dates and deadlines shall only be valid subject to Eurofins' written consent and Eurofins' agreement to modify any Delivery Date does not waive any claims for damages Eurofins may have resulting from such delayed delivery.

6.2. All Articles are provided with and accompanied by all information and instructions necessary for proper and safe use, including all information, documents and instructions required under any applicable law or regulation, as the case may be.

6.3. Delivery of Articles will be performed by the means and company agreed in the Agreement.

6.4. The Supplier shall immediately notify Eurofins, in writing, of any circumstances known or suspected that may cause a delay in delivery, stating the estimated period of delay.

6.5. In case of failure to deliver by the Delivery Date, unless agreed otherwise in writing, Eurofins is entitled to release itself from any obligation to accept and pay for the Articles. Eurofins, without limiting its other remedies, may use express delivery courier services and the difference between the express delivery courier services and the original transportation costs shall be paid by the Supplier. A failure to deliver by the Delivery Date shall give Eurofins the right to cancel all or part of the Articles under the respective Agreement, in either case without prejudice to its other rights and remedies and to purchase substitute Articles, and to hold the

to perform.

6.6. Eurofins is responsible for preparing the destination facility in advance according to the specifications provided by and the schedule agreed with the Supplier upfront in writing. In case the Supplier notices deficiencies in Eurofins' preparation work, the Supplier shall notify Eurofins and provide additional specification and requirements. The Supplier will not be responsible to the extent any delays are caused as a result of a failure from Eurofins to meet these agreed-upon specifications.

6.7. In the event that the Supplier or any of its representatives negligently or wilfully breach the obligation to effect delivery of Articles on the Delivery Date, the Supplier shall be obliged to pay to Eurofins liquidated damages in the amount of 1% of overdue contractual value per each week, up to a maximum amount equal to 12% of the overdue contractual value; in which the foregoing represent the intention of the parties to provide a genuine pre-estimate of the minimum damages to be suffered by Eurofins in such event. The parties agree that the sums payable under this subsection 6.7 shall constitute liquidated damages and are not penalties, and are in addition to all other rights of Eurofins, including the right to declare Supplier to be in breach of the Agreement. The parties further acknowledge that (i) the amount of loss or damages likely to be incurred is incapable or is difficult to precisely estimate, and (ii) the amounts specified in this subsection bear a reasonable relationship to, and are not plainly or grossly disproportionate to, the probably loss likely to be incurred in connection with any failure by Supplier to deliver the Articles. Liquidated damages are not intended to be a penalty and are solely intended to compensate for damages.

6.8. The Supplier is not entitled to make early and partial deliveries without prior written consent of Eurofins. If early and partial deliveries were nevertheless made, at Eurofins' discretion such deliveries may be returned at the Supplier's risk and expense. Eurofins reserves the right to keep the Articles shipped ahead of schedule and make payment as if the delivery was made per the delivery schedule.

## 7.   Insurance

7.1. Unless otherwise specified by Eurofins in writing, Supplier shall maintain and cause Supplier's subcontractors to maintain during the term of this Order

7.1.1.  Workers' compensation insurance as prescribed by the law of the state, province or nation in which any Services are performed;

7.1.2.  Employer's liability insurance with limits of at least $1,000,000 for each occurrence;

7.1.3.  Errors and Omission insurance with limits of at least (i) $1,000,000 or (ii) the total value of all active purchase orders, whichever is greater, per claim.

7.1.4.  Automobile liability insurance if the use of motor vehicles is required hereunder, with limits of at least (i) $1,000,000 or (ii) the total value of all active purchase orders, whichever is greater, per claim; and

7.1.5.  Commercial General Liability ("CGL") insurance, including, without limitation, Blanket Contractual Liability and Broad Form Property Damage, with limits of (i) $1,000,000 or (ii) the total value of all active purchase orders, whichever is greater, per claim.

7.2. All CGL and automobile liability insurance shall designate Eurofins, its affiliates, and its directors, officers, and employees (all referred to as "Eurofins") as additional insureds. All such insurance must be primary and non-contributory and required to respond and pay prior to any other insurance or self-insurance available. Supplier and Supplier's subcontractors shall furnish, prior to commencement of any order, certificates or adequate proof of the foregoing insurance, including, without limitation, endorsements and policies. The policies evidencing required insurance shall contain an endorsement to the effect that any cancellation or any material change adversely affecting the interest of Eurofins shall not be effective (1) for such period as the laws of the State in which this Order is to be performed prescribe or (2) until thirty (30) days after the insurer or Supplier gives written notice to Eurofins, whichever period is longer. Insurance companies providing coverage under this Order must be rated by A. M. Best with at least an A-rating. Supplier's obligation to obtain the foregoing insurance does not waive or release Supplier's liabilities or duties to indemnify under this GTP.

## 8.   Transfer of title and transfer of risks

8.1. Unless otherwise provided in the Agreement, title to the Articles shall pass to Eurofins only upon receipt by Eurofins of the Products, Software and/or at the completion of the performance of the Services at the agreed place of delivery (the "**Transfer of Title**").

8.2. If the Articles relate to the supply of machinery and other mechanical, electrical and electronic equipment and software, including related consulting and implementation services, the Supplier is obliged to perform

the test of the Article upon installation (herein Site Acceptance Test "**SAT**" and Functional Acceptance Test "**FAT**"). The Supplier owns the equipment until the outcome of the test is positive, only then the Transfer of Title comes into effect. Notwithstanding the foregoing, Eurofins has the right to perform SAT and FAT tests in-house in Supplier's representative presence.

**9.    Conformity**

9.1.  The Supplier warrants to Eurofins (the "**Warranty of Conformity**") that all Products and Software, including the packaging and the labelling and any documents relating thereto (such as e.g. safety data sheets):

  – conform to the Supplier's specifications, designs, drawings, samples, symbols or other description;

  – conform to the specifications, drawings, samples, symbols or other description specified by Eurofins in the Agreement, if any;

  – conform in all respects with the requirements of any statutes, orders, regulations or by-laws from time to time in force, and bear the CE approval mark, if applicable;

  – are fit and suitable for the purpose intended;

  – be manufactured according to the state of the art as applicable at the time of Order;

  – be free and clear of all liens and encumbrances; and

  – are free from any defects.

9.2.  In the event of nonconforming Articles, within three (3) months from receipt of the Articles by Eurofins, Eurofins shall notify Supplier, by any means of communication, of such nonconformity.

9.3.  The Supplier shall, within ten (10) calendar days from the receipt of the nonconformity notice, at Eurofins' choice, replace or repair all nonconforming Articles, at no cost to Eurofins.

9.4.  All risk and transportation charges for return and delivery shall be borne by Supplier. The Supplier will reimburse Eurofins for all costs, expenses and damages incurred by Eurofins as a result of such nonconformity.

9.5.  The Warranty of Conformity is in addition to all applicable statutory warranties and conditions and all other warranties specified herein, and in particular the Additional Warranty (as defined hereinafter), or in the Agreement or implied by law and shall survive acceptance and payment.

9.6.  If the Supplier fails to accept return or repair of nonconforming Articles or fails promptly to replace the nonconforming Articles, Eurofins, without limiting its other rights, may, at Supplier's expense, replace, correct or repair the nonconforming Articles itself or through a third party or terminate the Agreement and claim for the refund of the nonconforming Articles.

**10.    Additional Warranties**

10.1.  The Supplier grants an additional warranty on the Articles (the "**Additional Warranty**") for a period of at least two (2) years starting on the Delivery Date (the "**Additional Warranty Period**").

10.2.  During the Additional Warranty Period, the Supplier undertakes to repair or exchange the Articles in the event of malfunction, mistake, latent or apparent defect, or failure of proper operation.

10.3.  In the event any Article being inoperable during the warranty period for forty-eight (48) hours or more, the warranty period shall be extended for the duration of the inoperability of the Articles.

10.4.  In any event, the Supplier will be liable for, and will bear all direct and indirect financial consequences of, any damages of whatsoever nature to persons and/or properties, as well as taking all appropriate actions required by any public authority or on a voluntary basis and regardless of the motivation, i.e. latent defect, nonconformity to a legal provision or regulation, safety defect, etc.

10.5.  The Supplier also warrants the continued availability to Eurofins of materials, components and spare parts at normal market prices or an equivalent or better product (at the same price as the Product initially ordered/offered) for a period of ten (10) years as from the delivery date of the Products, but not longer than the usual lifetime of the Article.

10.6.  If Eurofins has grounds for considering an employee of the Supplier or a third party retained by the Supplier performing Services to be unsuitable, the Supplier undertakes to replace such person as soon as possible. The costs relating to the replacement's learning curve, up to a maximum of 15 working days, will be borne by the Supplier.

**11.    Foreign trade and payments law**

11.1.  The Supplier warrants that for the term of this Agreement, in relation to any applicable economic and trade sanctions imposed by the United Nations, the European Union, the United States of America, Canada or any other country, that:

  – it is not the target of any applicable Economic Sanctions;

Economic Sanctions;

- it shall comply with all applicable Economic Sanctions Laws. Without limiting the generality of the foregoing, the Supplier shall not (i) directly or indirectly export, re-export, tranship or otherwise deliver the Articles or any portion of the Articles in violation of any applicable Economic Sanctions Law, or (ii) broker, finance or otherwise facilitate any transaction in violation of any applicable Economic Sanctions Law;

- it is not engaged in any proceedings or subject to any investigations from authorities for the alleged breach of any Economic Sanctions Law.

11.2. The Supplier shall indemnify Eurofins against any losses, liabilities, damages, fines, costs (including but not limited to legal fees) and expenses incurred by, or awarded against, the Supplier as a result of any breach of clause A.11.1 by the Supplier.

11.3. Without affecting any other right or remedy available to it, Eurofins may terminate this Agreement with immediate effect by giving written notice to the Supplier if the Supplier commits a breach of clause A.11.1, and the Supplier shall not be entitled to claim compensation or any further remuneration.

For the purpose of this clause:

- "**Economic Sanctions**" means any economic sanctions, restrictive measures or trade embargoes adopted by the UN Security Council, the European Union, Canada, the United States of America or any other sovereign government.

- "**Economic Sanctions Law**" means any law, regulation or decision enacting Economic Sanctions.

## 12. Compliance with applicable laws and regulations; ethical conduct

12.1. The Products must comply with all applicable law and regulation without limitation, including but not limited to:

- the quality, composition, labelling and presentation of the Products;
- applicable labor laws, in particular, regarding children work;
- environmental laws and regulations.

12.2. The Supplier shall be responsible for ensuring that the Products comply with all federal, state, provincial, local and foreign laws relating to pollution or protection of human health or the environment including laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands, or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations, issued, entered, promulgated or approved thereunder ("Environmental Laws").

12.3. Supplier acknowledges that Eurofins prioritizes having the lowest environmental (during their entire life cycle) and the most positive social (no child labour, occupational health and safety, regulatory compliance) impact. Therefore, the Supplier shall comply with Eurofins' Supplier Code of Ethics (https://cdnmedia.eurofins.com/corporate-eurofins/media/12152996/20200106-v1-eurofins-supplier-code-of-ethics-final-27052020.pdf;) and any applicable supply chain law (including the California Transparency in Supply Chains Act). The Supplier shall ensure, that subcontractors in the supply chain also comply with any applicable supply chain law and Eurofins' Supplier Code of Ethics.

12.4. The Parties consider ethical conduct a prerequisite for successful business, and each Party has adopted policies to ensure both good internal governance and sound relationship with reliable third parties. In addition, each Party specifically undertakes to the other Party that:

- all of its commercial activities and processes relating to its business with the other Party fully comply, at all times, with all applicable laws, regulations, other legal requirements, norms and standards applicable in the markets where that Party operates and/or has contractual relationship(s) and, where applicable, with ISO 37001, the U.S. Foreign Corrupt Practices Act 1977 ("FCPA"), the Canada Corruption of Foreign Public Officials Act, UK Bribery Act 2010 and French Criminal Code as amended and supplemented by the Law No 2016-1691 of 9 December 2016 on transparency, the fight against corruption and modernisation of economic life ("Loi Sapin II");

- all of its transactions or import, export and re-export activities and processes relating to its business with the other Party will be conducted in full compliance with all applicable import and export control laws, regulations and policies, including but not limited to those promulgated by the U.S. Department of State (such as the International Traffic in Arms Regulations (ITAR)) or the U.S. Department of Commerce,

Bureau of Industry and Security (such as the Export Administration Regulations (EAR)), as well as, governmental trade restrictions and international sanctions, including where applicable, but not limited to, UN Security Council sanctions, the OFAC Sanctions Program and Lists (https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx) and sanctions adopted by the United States, Canada, and the European Union (https://sanctionsmap.eu/#/main); and

– furthermore, Supplier shall at all times comply and cause its personnel to comply with the Eurofins Group Code of Ethics, the Eurofins Group Anti-Bribery Policy, the Eurofins Supplier Group Code of Ethics as well as other policies available for consultation at https://www.eurofins.com/investor-relations/corporate-governance/eurofins-core-compliance-documents/.

– Eurofins is a covered U.S. federal contractor [or subcontractor] and must comply with certain affirmative action efforts. Also, pursuant to 41 CFR 60- 300.44(f)(i)(ii), implementing 38 U.S.C. 4212, a portion of the Vietnam Era Veterans Readjustment Assistance of 1974, and 41 CFR 60-741.44(f)(i)(ii), implementing Section 503 of The Rehabilitation Act of 1973; Eurofins must send you written notification of our affirmative action efforts on behalf of protected veterans and individuals with disabilities.

– Eurofins' subcontractors, suppliers and vendors shall comply with all of their applicable obligations under U.S. Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212, or any other law requiring equal opportunity for disabled persons, and other protected veterans, or any substantially equivalent law applicable in the resident jurisdiction of the Supplier Further, the equal employment opportunity clauses set forth in 41 CFR 60-1.4(a), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a), as applicable, are hereby incorporated by reference into all of the transactions between our companies.

– The supplier and all covered subcontractors shall abide by the requirements of 29 CFR Part 741, 41 CFR 60-1.4(a), Appendix A to Subpart A, 60-300.5(a) and 60-741.5(a), or any law applicable in the resident jurisdiction of the Supplier with similar intent and scope as described herein. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.

12.5. Eurofins reserves the right to audit whether the Supplier is in compliance with obligations set forth this in clause A.12 via document based or on-site audits (directly or through its partners and/or independent auditors / audit companies). Supplier commits to fully cooperate with any such audit and will in particular accept on-site visits, provide access to relevant personnel and provide any documents reasonably requested in the course of the audit.

12.6. Any of the aforementioned provisions of this clause A.12 are considered material obligations, the breach of which might result in termination with immediate effect and may give rise to claim for damages, including but not limited to, reputational damages.

### 13.   Intellectual property rights

13.1. The Supplier represents, warrants and guarantees that all required licenses in relation to the Articles are and shall remain valid and in full force and that the scope of such licenses shall properly cover the intended use of the Articles.

Such licenses shall include the right for Eurofins to transfer and to grant sublicenses, especially to its affiliates.

13.2. The Supplier represents, warrants and guarantees that the manufacture, delivery, sale, license and use of the Articles will not infringe any intellectual property rights (patents, trademarks, designs, copyrights or other similar registered or unregistered rights) of any third party. The Supplier further guarantees that Eurofins has the right to use and/or reproduce pictures of the Articles on any medium, including its internet website.

13.3. The Supplier covenants and undertakes that it will, upon Eurofins request, at the Supplier's expense, defend or assist in the defense of any suit or action that may be brought against Eurofins, its directors, officers,

representatives, employees or affiliates (the "**Eurofins Indemnitees**"), for any infringement or claim thereof predicated upon the manufacture, delivery, use, licence or resale of Supplier's products.

13.4. The Supplier further covenants and undertakes to hold Eurofins or Eurofins Indemnitees harmless from all loss, damages or liability which may be incurred by Eurofins or Eurofins Indemnitees on account of any infringement or alleged infringement of intellectual property rights of any third party arising out of the use or sale of the Articles.

13.5. If Eurofins' use of the Articles provided by Supplier is enjoined based on an intellectual property infringement claims, Supplier shall, at its own expense, either procure for Eurofins the right to continue using the Articles or, after consulting with Eurofins and obtaining Eurofins' consent, replace or modify the Articles with substantially similar and functionally equivalent non-infringing Articles.

13.6. To the extent the Articles (other than Software Articles) delivered to Eurofins include or rely upon intellectual property of the Supplier, Eurofins shall be allowed to use Supplier's intellectual property, at no cost to Eurofins, for the purpose of using the Articles. For greater certainty, with respect to Software Articles the licenses granted under section D of this GTP shall apply.

## 14. Limitation of Liability / Indemnification

14.1. Unless otherwise provided in the Agreement, to the greatest extent permitted by law, Eurofins and Eurofins Indemnitees shall only be liable:
  – if the Supplier can demonstrate a direct and immediate loss or damage caused by Eurofins' wilful misconduct within the framework of the Agreement; and
  – if Eurofins has received written notice thereof no later than six (6) months after the Supplier's knowledge of the relevant claim.

14.2. To the greatest extent permitted by law, in no event shall Eurofins be liable towards the Supplier or third parties for (i) any business loss (including loss of profits, revenue, contracts, anticipated savings, data, goodwill or wasted expenditure), or any indirect, incidental or consequential losses or damage, or (ii) any amount that exceeds, in the aggregate, the lesser of (x) the amount of fees paid under the applicable Order in the 12 month period immediately preceding the date of the event giving rise to the claims, or (y) \$50,000.

14.3. The Supplier shall hold harmless and unconditionally indemnify Eurofins and Eurofins Indemnitees and its partners to the full extent of any liability, loss, cost, claim, damage or expense including, but not limited to, reasonable attorneys' fees for the defence of all liabilities, costs, claims, damages and expenses by reason of any alleged or actual property damage or personal injury arising out of, as a result of, or in connection with the breach of any term of the GTP by the Supplier, the Services performed and/or the Products supplied under the Agreement and due to any act or omission of the Supplier or its employees, agents, subcontractors.

## 15. Force majeure

15.1. Neither Party shall be responsible for delays in delivery or performance because of intervention of any event that is unforeseeable by and/or beyond the reasonable control of such Party that prevents such part from performing its obligations under an Agreement (the "**Force Majeure**"). Cases of Force Majeure include but are not limited to: labor disputes, pandemic, epidemic, intervention of civil or military authorities, war or hostilities, declared or not declared, acts of terrorism, riots, natural disasters, fire, water damage, malfunction or interruption of the telecommunications network or of the electricity network.

15.2. In no event shall lack of finances be considered as a cause beyond the control of a Party.

15.3. The Party affected by the Force Majeure event shall give prompt notice thereof and, upon cessation of the Force Majeure event, take all reasonable actions to resume compliance with its obligations. If a delay in delivery or performance extends beyond sixty (60) calendar days, then either Party may terminate the Agreement.

## 16. Confidentiality

16.1. In this clause, "**Proprietary Information**" shall mean all information marked as confidential hereafter transmitted, regardless of how transmitted, directly or indirectly from Eurofins and received by the Supplier, including but not limited to the business, financial conditions, operations, assets, liabilities, technology, know-how, products, trade secrets, inventions, services, and other technical or business information related thereto and belonging to Eurofins, as well as any disclosed information whose nature makes it obvious that it is confidential. Proprietary Information shall also include the fact that information has been provided or discussions are taking place between the Parties, as well as the status and content of such discussions

Proprietary information shall expressly include information which is derived through Supplier's observations of Eurofins' facilities or operations.

16.2. Proprietary Information disclosed by Eurofins to the Supplier shall be held in confidence by the Supplier and shall not be used, reverse engineered or disclosed to others or in any way exploited for the benefit of the Supplier other than its use by the Supplier solely with the aim of performing its obligations pursuant to this Agreement.

16.3. The Supplier shall not, either during the performance of the Agreement and for a period of 3 (three) years subsequent to its termination, without Eurofins' express, prior written permission, use or disclose Proprietary Information to any third party or to any of the Supplier's employees, directors, officers, legal representatives, affiliates, agents or advisers (jointly referred to as the "**Authorized Recipients**") except where strictly required for the sole purpose of the performance of Supplier's duties under the Agreement or in the event the Supplier is obliged to disclose Proprietary Information pursuant to the provisions of the applicable law, a court order or a legitimate request from the relevant authorities. The Supplier shall advise Authorized Recipients of the confidential nature and all such Authorized Recipients shall have agreed to safeguard it either under a separate confidentiality obligation, their employment or service contracts (in each case with terms substantially similar to the obligations set forth herein) or under a statutory duty of confidentiality.

16.4. The Supplier shall safeguard (and shall ensure that its Authorized Recipients safeguard) the Proprietary Information in a manner consistent with the protection of its own proprietary information of a similar nature, but in all cases using no less than a reasonable degree of care. Supplier shall be liable for its Authorized Recipient's compliance with this clause A.16.

16.5. The Supplier shall not, without the prior written consent of Eurofins, in any manner use Eurofins's logo, advertise or publish or issue any news release, or make any public announcement or deny or confirm the fact that Supplier has sold or contracted to sell the Articles to Eurofins.

16.6. The above will not affect the Supplier's rights to use or disclose Proprietary Information which the Supplier can demonstrate:
  – at the date of its receipt, is part of the public domain or, after such date, becomes part of the public domain, through no fault or negligence of Supplier;
  – by contemporaneous written evidence that it was already in its possession from a source other than Eurofins at the date of its receipt;
  – has been disclosed to the Supplier without an apparent breach of a confidentiality obligation towards Eurofins; or
  – by contemporaneous written evidence that it was developed without benefit of the Proprietary Information disclosed hereunder by Eurofins before or after disclosure.

16.7. The Supplier shall return or destroy and will ensure that the Authorized Recipients shall return and destroy all Proprietary Information (including all copies, notes and/or extracts thereof) supplied by Eurofins upon request of Eurofins. Unless Eurofins advises the Supplier otherwise in writing, any analyses, compilations, technical drawings, studies or other documents incorporating or utilizing the Eurofins' Proprietary Information and prepared by the Supplier and its Authorized Recipients shall be destroyed or, in the case of digital or electronic media, deleted. This shall not apply to the extent Proprietary Information is kept in automated backup solutions where deletion would require unreasonable commercial efforts or as long as the Proprietary Information needs to be retained and archived by the Supplier due to regulatory or statutory obligations.

## 17. Termination of the Agreement

### 17.1. Termination without cause by Eurofins

17.1.1. Eurofins may terminate Successive Performance Agreements with a notice period of at least three (3) months by registered letter with receipt.

17.1.2. Upon receipt of such written notice from Eurofins, the Supplier agrees to stop all or part of the work relating to the Agreement to the extent specified in the notice.

17.1.3. In the event the Agreement is terminated, the Supplier is entitled to receive payment for the Products and Software delivered and/or of the Services performed at the price agreed in the Agreement (the "**Last Payment**") until the end of the notice period.

17.1.4. If the Last Payment is not determinable, Eurofins and the Supplier will agree upon an equitable adjustment of the price, provided that:
  – such adjustment shall not exceed the total price agreed under the Agreement; and

17.1.5. The Supplier will not be entitled to claim for any damages against Eurofins in the event of termination of the Agreement.

### 17.2. *Termination with immediate effect*

17.2.1. Without prejudice of the above provisions as well as the provisions of applicable laws, each of the Parties may terminate in writing the Agreement with immediate effect and without incurring any liability in the event of the occurrence of an Event of Default (as defined hereinafter).

17.2.2. The following events constitute Events of Default for the non-breaching Party:

- – breach of any provision of the Agreement arising out of wilful misconduct by one of the Parties and such breach is not cured within seven (7) calendar days after notice thereof is received by the breaching Party;
- – breach by one of the Parties of a substantial provision of the Agreement (such as, without limitation, the failure of the Supplier to deliver the Products or Software or to perform the Services within the time specified in the Agreement, breach of the confidentiality clause, IP rights clause, breach of the conformity and warranty clauses) and such breach is not cured within seven (7) calendar days after notice thereof is received by the Supplier;
- – the Supplier is in breach of a non-substantial provision of the Agreement and such breach is not cured within thirty (30) calendar days after notice thereof is received by the Supplier;
- – the Supplier suspends or threatens to suspend, or ceases or threatens to cease to carry on, all or a substantial part of its business;
- – one of the Parties ceases to conduct its operations in the normal course of business, including the inability to meet its obligations as they mature, or if any proceeding under any applicable bankruptcy or insolvency laws is brought by or against the Supplier, or a receiver/trustee for the Supplier is appointed or applied for, or an assignment for the benefit of creditors is made by the Supplier;
- – breach of the confidentiality clause under clause A.16 herein.

(each of these events being individually an "**Event of Default**").

### 18. Assignment and set off rights of Supplier

18.1 The Supplier shall not assign the Agreement or any of its rights under the Agreement without the prior written consent of Eurofins.

18.2 The Supplier may not offset sums due from Eurofins to the Supplier's affiliates against any sums Supplier owes to Eurofins.

### 19. Remedies and waivers

19.1. No failure by Eurofins to exercise, nor any delay by Eurofins, in exercising, any right or remedy hereunder, shall operate as a waiver thereof or of any right or remedy hereunder, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

### 20. Applicable law / jurisdiction

20.1. Unless otherwise agreed in writing between the Parties, the Agreement is governed by, and shall be construed in accordance with, the laws of the State of Delaware, U.S.A., excluding its conflict of laws rules. The application of the United Nations Convention on Contracts for the International Sale of Goods is expressly excluded.

20.2. The Supplier agrees that, unless otherwise provided in the Agreement, the the state and federal courts in the State of Delaware, U.S.A. shall have exclusive jurisdiction to resolve any dispute, which may arise out of, or in connection with, the GTP and that accordingly any proceeding, suit or legal action arising out of, or in connection with, the GTP shall be brought in such courts. Each party consents to the personal jurisdiction of the state and federal courts in the State of Delaware, U.S.A., and waives any right it may have to a trial by jury in any such proceeding, suit or legal action.

20.3 If the Parties agree to arbitration, such arbitration shall be administered by the American Arbitration Association in accordance with its International Arbitration Rules. The arbitration shall be conducted in the City of Philadelphia, Pennsylvania, U.S.A., and the language of the arbitration shall be English.

### 21. Miscellaneous

21.1 The invalidity, illegality or unenforceability of any provision of the GTP and/or of the Agreement shall not affect the continuation in force of the remainder of the GTP and the Agreement.

21.2 The GTP may only be waived, altered, amended or modified in a frame-agreement signed by an authorized representative of Eurofins and the Supplier, that shall expressly specify that it prevails over these GTP, if any, failing which these GTP, will remain in force and will prevail over this Agreement.

21.3 Unless otherwise specified in the Agreement, each demand, notice or other communication to be made hereunder shall:
- be made in writing in the English language; and
- be made to the following address:
  - ○ Eurofins : Eurofins' address as it appears above.
  - ○ Supplier: Supplier's address is as appears in the Agreement

**B.**
## Specifications for Purchase of Products

### 1. General
The following provisions under this section B of this GTP apply in addition to clauses under section A of this GTP as and in so far the Agreement relates to the purchase of Products.

### 2. Delivery of Products
Delivery of Products shall be made according to DDP (Delivery Duty Paid) unless otherwise mutually agreed by the Parties. DDP shall have the meaning ascribed in the International Chamber of Commerce Incoterms 2020.

### 3. Packaging
3.1. The Products shall be correctly and sufficiently packed in an appropriate packaging and protect the Products in a proper manner from possible transport damages. The Products shall be marked with the order number, the net, gross weights, the Supplier name, the details of the contents shall be clearly marked on each container and all containers of hazardous goods (and all relating documents) shall bear prominent and adequate warnings.

3.2. The Supplier is responsible for any loss or damages, as well as for any missing Products arising from an inappropriate or improper packaging, labelling or marking. The Supplier shall indemnify and keep indemnified Eurofins against all actions, suits, claims, demands, losses, charges, costs and expenses (including legal expenses and disbursements) which Eurofins may suffer or incur as a result of or in connection with any breach of this clause B.3.2 to the extent that any such damage or injury is attributable to any act, omission or negligence of the Supplier or any of its sub-contractors.

3.3. The Supplier shall, at its expense, obtain all necessary custom clearance, export licenses, approvals and authorizations required to ship and/or import or export the Products.

**C**
## Specifications for Provision of Services

### 1. General
The following provisions under this section C of this GTP apply in addition to clauses under section A of this GTP as and in so far the Agreement relates to the provision of Services.

### 2. Performance of Services
2.1. The Supplier shall perform the Services strictly on or within the time agreed in the Agreement and in a professional, competent, diligent, and workmanlike manner by knowledgeable, trained and qualified personnel, all in accordance with the terms of the Agreement and the highest standards of performance applicable to service providers in the industry for similar tasks and projects.

2.2. The Supplier's employees, agents and representatives (hereinafter collectively "**Employees**") performing Services shall at all times be under the Supplier's direction and control. Supplier shall pay all wages, salaries, and other amounts due its Employees in connection with performance under this Agreement, and shall be responsible for all reports and obligations for its Employees, including, but not limited to, social security and income tax withholdings, unemployment compensation, worker's compensation, and equal employment opportunity reporting.

2.3. Unless otherwise agreed, the Supplier shall perform the Services during Eurofins' regular working hours. However, Eurofins' may require the Supplier to perform Services outside such working hours. In that event, the Supplier will not be allowed to add a surcharge unless otherwise agreed in writing between the Parties.

### 3. Supplementary Work / Tender

approved in advance and will be included in an additional written agreement. The additional agreement will be subject to the same terms as the original acceptance and must be approved in writing by an authorized representative of Eurofins. It is the responsibility of the Supplier to inform Eurofins as soon as the possibility of additional work not covered by the original Agreement arises. Without an additional agreement duly signed by Eurofins, any additional or supplementary work carried out by the Supplier will be considered to be part of the contract and will be covered by the amounts specified in the Agreement already signed. In these circumstances Eurofins will not be required to pay any additional payment. Supplementary work that has been necessary because of poor quality of service, mistakes or omissions from the Supplier will be undertaken by the Supplier even if the defects or omissions are noted after completion of any work or service.

3.2. Where a tender is requested from Supplier regarding the Services, in certain cases, a Supplier will be selected upon an estimated budget for various work spread out over a certain period. Eurofins will sign a frame agreement with the Supplier for the work to be carried out. These frame agreements should comply with the GTP. The Supplier will be obliged to provide quotation for each Service included in the global budget and to obtain the signed approval from Eurofins before starting work. A detailed quotation must be supplied to Eurofins for each Service indicating the non-revisable contract prices applicable for each item of the budget.

3.3. Each quotation will have to be approved by an authorized representative of Eurofins and will constitute an addendum to the frame agreement. In so far as the main Supplier who is the beneficiary of the frame agreement, subcontracts work (printing work for example) to another Supplier, Eurofins reserves the right to request tenders for this work and to select the most appropriate subcontractor. Eurofins will not be obliged to obtain the approval of the main Supplier for either the selection of the subcontractors to be contacted, or on the chosen subcontractor to do the work.

3.4. Any subcontracted work without approval of a specific quotation by Eurofins will be the financial responsibility of the Supplier. It is specifically agreed that the approval by Eurofins of a master budget will not imply the approval of the cost of each item of the budget which will be required to have detailed estimates that allow competition between suppliers. Quotations from Suppliers must reach Eurofins no later than 15 days before the date of the approval of the quotation by Eurofins to assure the completion of the services required within the timeframe required.

## D.
## Specifications for Licensing or Provision of Software Articles

### 1. General

The following provisions under this section D of this GTP apply in addition to clauses under section A of this GTP as and in so far the Agreement relates to the licensing or provision of Software or Products or Services relating to information technology irrespective if Software and Products are stand alone or combined in any matter (jointly referred in this section D refereed as "**Software Articles**") and regardless of whether the license is granted for a limited or unlimited time period and regardless of the licencing model (such as purchase, licence, software as a service – SaaS and similar subscription models).

### 2. License of Software Articles

2.1. The Supplier grants Eurofins for the time period agreed in the Agreement an irrevocable, worldwide and nonexclusive license to use the Software Articles, including storing, copying, maintaining and supporting the Software Articles (including any interfaces between the Software Articles and any third party hardware and software). The license includes but is not limited to (i) use or application of the Software Articles at a central process unit or other device, (ii) use of the Software Articles for test and development activities, (iii) processing and copying any documentation with respect to the Software Articles for use within Eurofins' organization, and (iv) preparing a reasonable number of copies for the benefit of use, tests, development, training, archiving, maintenance and back-up.

2.2. The license shall apply to the Software Articles and any versions, updates and upgrades to it provided to Eurofins, its manual (documentation) and any and all applications and functionalities created by the Software Articles.

### 3. Delivery of Software Articles

3.1. The Software Articles shall be delivered entirely complete and ready for use on the Delivery Date agreed in the Agreement.

3.2. Unless otherwise agreed in writing, if new Software Articles is delivered, the latest release of that Software Articles will be delivered. All tools that are required for sound operation, additional documentation and application software will also be delivered, even if that has not been agreed in so many words.

## 4. Maintenance

4.1. Supplier agrees that it will make available to Eurofins at no extra cost the full toolset necessary for performing Supplier's support/maintenance, including but not limited to full administrative access rights over the Software Articles.

4.2. Supplier agrees that Eurofins has the right to request at no extra cost changes on the Software Articles necessary to provide Eurofins with a toolset for maintenance and security processes including, but not limited to, remote access solution and security tools; Supplier will support Eurofins IT department at no extra cost in the necessary change management process in configuration, testing and tuning.

4.3. Supplier agrees that throughout the full agreed period of use of the Software Articles Eurofins shall have full access management on the Software Articles, including but not limited to full administrative access rights; during this period every transitive technical or logical rights reasonably necessary to perform the full control over the Software Articles will be granted.

## 5. Tests and safeguards

5.1. Supplier agrees that Eurofins has the right to process security tests on the Software Articles, including but not limited to vulnerability scans or penetration testing.

5.2. Supplier agrees to deliver upon Eurofins' request any existing reports of vulnerability scans to Eurofins and Eurofins has the right to use such reports (and any data contained therein) for evaluation of the Software Articles and for safeguarding Eurofins information security.

5.3. In the event that tests cannot be performed in a Eurofins environment, Supplier agrees to deliver to Eurofins any change testing reports performed in Supplier's testing environment; this shall include (but is not limited to) testing reports relating to operating systems upgrades and updates, security tools implementation., upgrades and updates.

5.4. Eurofins will not disclose the results of any security test to any third party, except to its affiliates, employees, consultants or contractors on a strict need-to-know basis, and solely for purposes of ensuring Eurofins information security.

5.5. Supplier agrees that nothing shall prevent Eurofins from setting up and maintaining physical, technical, and administrative safeguards on any of its IT systems (including the Software Articles), such as updates and patches to operating system and applications or firmware and driver updates. Such safeguards shall be at least at the level of industry standards in the cloud computing or on-premises services industry.

## 6. Appropriate measures, changes

6.1. Supplier will take appropriate measures to ensure that Supplier systems connecting to Eurofins systems and anything provided to Eurofins through such systems (including, not limited to the Software Articles) do not contain any programs, mechanisms, programming devices, malware or other computer code (i) designed to disrupt, disable, harm, or otherwise impede in any manner the operation of any software program or code, or any computer system or network (commonly referred to as "malware", "spyware", "viruses" or "worms"); or (ii) that would disable or impair the operation of Eurofins systems or of any software, computer system or network in any way based on the elapsing of a period of time or the advancement to a particular date or other numeral (referred to as "time bombs", "time locks", or "drop dead" devices); or (iii) designed to or that could reasonably be used to permit a Party or any third party to access any computer system or network (referred to as "trojans", "traps", "access codes" or "trap door" devices); or (iv) designed to or that could reasonably be used to permit a Party or any third party to track, monitor or otherwise report the operation and use of any software program or any computer system or network by the other Party or any of its customers.

6.2. Data created by or resulting from Eurofins activities (the "**Eurofins Data**"), including but not limited to sales data, hosted, stored, or otherwise held by Supplier in the Software Articles or in any solution operated by Supplier, or on any device owned or in the custody of Supplier, its affiliates, employees, agents or contractors, will be encrypted. Supplier will not transmit, and will ensure that none of its affiliates, employees, agents or contractors transmit, any unencrypted Eurofins Data over the Internet or a wireless network, and will not store, and will ensure that none of its affiliates, employees, agents or contractors store, any Eurofins Data on any mobile computing device, such as a laptop computer, USB drive or portable data device, except where there is a business necessity and then only if the mobile computing device is protected by industry standard encryption software.

6.3 ...the Supplier must take an action or make a decision regarding implementing changes to the Software Articles, which may adversely affect the function or performance of the Software Articles without first obtaining Eurofins written approval to such changes, which approval Eurofins may withhold at its absolute discretion. Supplier must move applications from non-production environments to the production environment in a controlled and documented manner, so that no unapproved changes are introduced into the applications during any such move.

## 7. Security Incident

7.1. In the event that Supplier becomes aware that the security of the Software Articles is adversely impacted, and this event subsequently affects or has the potential to affect control, integrity or confidentiality of Eurofins Data in the Software Articles (the "**Security Incident**"), the Supplier shall promptly (but in any case, not later than twenty-four (24) hours after becoming aware of such Security Incident):

  - assess the nature and scope of the Security Incident;
  - assess the scope of Eurofins Data affected by the Security Incident (also assessing potential future impact of the Security Incident on Eurofins Data) and proactively share this assessment with Eurofins;
  - take appropriate steps to contain, control and stop the Security Incident; and,
  - collaborate with Eurofins and any other stakeholders as may be required in particular by providing relevant information that can be used to address and mitigate the impact of the Security Incident, subject to the limitations on information exchange imposed by statutory law and further subject to any request by law enforcement or other government agencies to withhold information exchange pending the completion of an investigation.

7.2. The Parties will share among themselves any information that subsequently becomes available which may be useful for mitigating and/or preventing any effects of the Security Incident.

7.3. Eurofins will not disclose any information relating to the Security Incident to any third party unless such disclosure is required by statutory law. However, Eurofins shall have the right to inform any of its contractual partners of a Security Incident to the extent such information is required under the respective legal relationship.

7.4. In the event of a Security Incident the Supplier agrees to establish a security intelligence exchange communication channel with Eurofins. If Supplier has deployed *Threat Intelligence*, Eurofins may request resulting *Threat Intelligence Data* to be shared. Eurofins uses *Threat Intelligence Data* for threat analysis and mitigation, customer support, Software/Articles management and improvement, and research and development. *Threat Intelligence Information* will only be exchanged to the extent permissible under applicable law, in particular data protection law.

## 8. Warranty and updates

8.1. Supplier warrants that the Software Articles comply with Eurofins approved IT standards as described in the Agreement or any other document defining such Eurofins approved IT standards that was made available to Supplier.

8.2. Supplier warrants that the Software Articles is free of any overt or covert communication channels (aka backdoors) other than such communication channels expressly specified and disclosed to Eurofins and agrees that Eurofins will be granted full control over every communication channel included in the Software Articles in accordance with information security industry-standards.

8.3. Supplier will make generally available to Eurofins updates in order to maintain functionality of the Software Articles in the state of the art and in the contractual intended manner, including but not limited to functionality and combability with new operational systems, maintain security of the Software Articles, correct errors and fix bugs. The Supplier shall provide those updates for the complete time period of the license granting but no longer than the expected lifetime of the Software Articles. The Supplier shall bear all direct and indirect financial consequences regarding the updates.

**Executed by Eurofins**

Date: _____

**Executed by the Supplier**
**For Acceptance and Acknowledgement**
Date: _____

_____

_____

Name :
Title :

Name :
Title :

# EXHIBIT "B"

**HAMILT⚙N**
STORAGE

# Proposal for BiOS XL4 System for 500,000 tubes



For Scott Mattivi, Vice President of Operations, Viracor Eurofins

# EXHIBIT "C"

 **Viracor** | Eurofins BioPharma Services

# Eurofins Viracor Biopharma Services, Inc. PURCHASE ORDER

**HAMILTON STORAGE TECHNOLOGIES INC**
3 FORGE PARKWAY
FRANKLIN, MA 02038
Attn: Lisa Simmons
lsimmons@hamilton-storage.com
Phone: +1 (510) 329-1998

| | |
|---|---|
| PO NUMBER-REVISION | **US1221198251** |
| DATE | **05/10/21** |
| PAYMENT TERMS | **NET 60** |
| CURRENCY | **USD** |
| SHIPPING TERMS | **FOB Destination, freight prepaid and** |
| **charged back** | |
| SHIPPING METHOD | **Ground** |

---Ship To---
Eurofins Viracor Biopharma Services
Inc (348607)
18000 W. 99th Street
Lenexa, KS 66219
Attn: Amy Makovec

---Bill To---
Eurofins Viracor Biopharma Services,
Inc.
343 W. Main Street
Leola, PA 17540
Attn: Accounts Payable

accountspayable@eurofinsus.com

Notes:
- **Purchase Order Number must appear on all invoices, packages and correspondence.**
- **Invoices must be submitted through the Coupa Supplier Portal or via Supplier Actionable Notification.**
- **Order Confirmations and any questions regarding this order should be directed to**
  **USPurchasingDepartment@eurofinsus.com**

Note: 25% off discount applied to each individual line item.

## Current Lines

| Line | Description | Need By Date | Qty | Unit | Price | Total |
|---|---|---|---|---|---|---|
| 20 | Total from Quote# 575/ XL4 / 500k / 4 N/A | 01/01/22 | | | 1,650,789.12 | 1,650,789.12 |

~~1,650,793.50 USD~~
**1,650,789.12** USD

## Deleted Lines

| Line | Description | Shipping Method | Need By Date | Qty | Unit | Price | Total |
|---|---|---|---|---|---|---|---|
| 1 | Hamilton BiOS XL4 HST43004 | 01/01/22 | 1 | each | 1,029,817.50 | 1,029,817.50 |
| 2 | Universal Tube Picker BiOS HST43201 | 01/01/22 | 1 | each | 69,000.00 | 69,000.00 |
| 3 | BiOS 1D Side Barcode Reader INDSOL#10xxx | 01/01/22 | 1 | each | 45,000.00 | 45,000.00 |
| 4 | BiOS Labware Definition HST41285 | 01/01/22 | 6 | each | 3,675.00 | 22,050.00 |
| 5 | BiOS Product Specialist HST41242 | 01/01/22 | 2 | each | 6,249.75 | 12,499.50 |

| Line | Description | Shipping Method | Need By Date | Qty | Unit | Price | Total |
|------|-------------|-----------------|--------------|-----|------|-------|-------|
| 6 | BiOS Product Specialist HST41242 | 01/01/22 | 10 | each | 6,249.75 | 62,497.50 | |
| 7 | BiOS L/XL Cassette [16 Shelves - 91.9 mm Max. Labware Height] 36356-995 | 01/01/22 | 205 | each | 152.25 | 31,211.25 | |
| 8 | BiOS L/XL Cassette [17 Shelves 86.1 mm Max. Labware Height] 36356-936 | 01/01/22 | 337 | each | 152.25 | 51,308.25 | |
| 9 | BiOS L/XL Cassette [27 Shelves - 51.4 mm Max. Labware Height] 36356-590 | 01/01/22 | 64 | each | 173.25 | 11,088.00 | |
| 10 | BiOS XL Project Engineering HST41053 | 01/01/22 | 1 | each | 45,000.00 | 45,000.00 | |
| 11 | Site Survey HST14783 | 01/01/22 | 1 | each | 2,550.00 | 2,550.00 | |
| 12 | BiOS Site Acceptance Test (5 days) HST41286 | 01/01/22 | 1 | each | 9,562.50 | 9,562.50 | |
| 13 | Remote API Integration Support HST39547 | 01/01/22 | 1 | each | 6,750.00 | 6,750.00 | |
| 14 | BiOS Factory Acceptance Test (3 days) HST43089 | 01/01/22 | 1 | each | 18,375.00 | 18,375.00 | |
| 15 | BiOS XL Installation and Commissioning - Base System HST43080 | 01/01/22 | 1 | each | 87,825.00 | 87,825.00 | |
| 16 | BiOS XL Installation and Commissioning - Per Freezer HST43081 | 01/01/22 | 2 | each | 8,718.75 | 17,437.50 | |
| 17 | BiOS End User Training Onsite (3 days) HST41287 | 01/01/22 | 1 | each | 5,737.50 | 5,737.50 | |
| 18 | RackWare HDR-048-02 831461 | 01/01/22 | 9,501 | each | 12.00 | 114,012.00 | |
| 19 | RackWare HDR-060-01 831462 | 01/01/22 | 756 | each | 12.00 | 9,072.00 | |

## Added Lines

| Line | Description | Need By Date | Qty | Unit | Price | Total |
|------|-------------|--------------|-----|------|-------|-------|
| 20 | Total from Quote# 575/ XL4 / 500k / 4 N/A | 01/01/22 | | | 1,650,789.12 | 1,650,789.12 |

Information in this document is confidential and for the mentioned receiver only. Please contact Eurofins in case you have received this document by mistake or transmission error. Eurofins Terms and Conditions of Purchase are applicable to this purchase order and can be found by following link http://www.eurofinsus.com/terms-and-conditions/

Eurofins is a covered federal contractor [or subcontractor] and must comply with certain affirmative action efforts. Also, pursuant to 41 CFR 60- 300.44(f)(i)(ii), implementing 38 U.S.C. 4212, a portion of the Vietnam Era Veterans Readjustment Assistance of 1974, and 41 CFR 60-741.44(f)(i)(ii), implementing Section 503 of The Rehabilitation Act of 1973; Eurofins must send you written notification of our affirmative action efforts on behalf of protected veterans and individuals with disabilities.

Eurofins expects all of its subcontractors, suppliers and vendors to comply with all of their applicable obligations under Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212 or any other law requiring equal opportunity for disabled persons, and other protected veterans. Further, the equal employment opportunity clauses set forth in 41 CFR 60-1.4(a), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a) are hereby incorporated by reference into all of the transactions between our companies.

The supplier and all covered subcontractors shall abide by the requirements of 29 CFR Part 741, 41 CFR 60-1.4(a), Appendix A to Subpart A, 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.

# EXHIBIT "D"

**HAMILT⊛N**
STORAGE

# Proposal for BiOS XL4 System for 500,000  tubes



For Scott Mattivi, Vice President of Operations, Viracor Eurofins


STORAGE

Contact
Lisa Simmons
E-mail: lsimmons@hamilton-storage.com
Tel.: 508-544-7000 x1255
Mobile: 510-329-1998

Viracor Eurofins
Scott Mattivi
1001 NW Technology Drive
Lee's Summit, MO 64086
United States

April 26, 2021

**BiOS XL4 for 500,000 tubes**
**Quotation Nr.: 575 / XL4 / 500K / 4**

Dear Scott,

In regards to our recent discussions and Viracor Eurofins interest in the Hamilton Storage products, we are pleased to provide you with a quotation for your system.

This quotation is for the supply of the industry leading BiOS XL4 automated sample storage and retrieval system. **This BiOS XL4 quotation is configured to hold approximately 500,000 tubes.** The system is designed around maximizing sample integrity and stores and picks samples at -80°C. The picker is capable of processing multiple types of labware without mechanical changes or additional picking modules.

Unique to Hamilton Storage, and included in this proposal for your consideration is **BiOS Implementation Support Service.** This on-site service includes a full-time BiOS Product Specialist for the first three months upon installation completion. This person will provide daily operational and technical support to assist in integrating BiOS into the customer's standard operations. This value-add resource will work as a liaison between Viracor Eurofins and Hamilton to allow for a smooth integration into your operations and allow your team to focus on its normal daily tasks. This dedicated on site Hamilton FTE will ensure your team is comfortable with the new system. Answers to all day-to-day questions about the new automation system are immediate as a Hamilton FTE will be readily available every step of the way. Please let us know if you have any questions.

We are looking forward to collaborating with you on this project. Hamilton is a dedicated 4th generation family business focused on design and manufacture of precision automation and prides itself on being a dedicated partner along with supporting the system for its full life.

Hamilton Storage is the proven and true partner in automated Biobanks worldwide.

Yours sincerely,

HAMILTON Storage Technologies Inc.

Hamilton Storage Technologies Inc.     Phone:  508-544-7000     sales@hamilton-storage.com
3 Forge Parkway                        Fax:    508-544-7001     www.hamiltoncompany.com
Franklin, MA 02038 USA



Lisa Simmons

Regional Sales Manager, West

*Included with this document:*
A - Appendix A.Viracor Cassette BudgetingvXL4_5M.pdf
B - Terms and Conditions

*Attachments:*
C - 41759_01 - BIOS Product Line - General Technical
Specifications.pdf
D - BiOS XL4 Technical Data Sheet.PDF
E - BiOS XL4 Technical Drawing.PDF



**HAMILTON**
STORAGE

Quotation Nr.: 575 / XL4 / 500K / 4
BiOS XL4 for 500,000 tubes

## BiOS XL4

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|------|------|---------|----------|------------------|-------------|
| | | **Instrument** | | | |
| 1 | 1 | Hamilton BiOS XL4 (2 Freezers / 4 Bays) Please refer to BiOS Specification Document for additional information | HST43004 | 1,373,090.00 | 1,373,090.00 |
| 2 | 1 | Universal Tube Picker BiOS | HST43201 | 92,000.00 | 92,000.00 |
| 3 | 1 | BiOS 1D Side Barcode Reader For decoding the barcode on the side of the vial | INDSOL#10xxx | 60,000.00 | 60,000.00 |
| 4 | 6 | BiOS Labware Definition Engineering effort for system calibration for each type of labware | HST41285 | 4,900.00 | 29,400.00 |
| 5 | 2 | BiOS Product Specialist Hamilton Storage to provide an on-site, full-time product specialist on assignment for the first 3 months post site acceptance test. The person will provide daily operational and technical support to assist in integration of the BiOS into the customer's standard operations. This line item is for two weeks of no charge BiOS Product Specialist time. Discount applied is 100% | HST41242 | 8,333.00 | 16,666.00 |
| 6 | 10 | BiOS Product Specialist Hamilton Storage to provide an on-site, full-time product specialist on assignment for the first 3 months post site acceptance test. The person will provide daily operational and technical support to assist in integration of the BiOS into the customer's standard operations. This line item is for 10 weeks of BiOS Product Specialist time | HST41242 | 8,333.00 | 83,330.00 |
| | | **Subtotal for Instrument** | | | 1,654,486.00 |
| | | **Cassettes** | | | |
| 7 | 205 | BiOS L/XL Cassette [16 Shelves - 91.9 mm Max. Labware Height] | 36356-995 | 203.00 | 41,615.00 |

**HAMILT⊕N**
STORAGE

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|---|---|---|---|---|---|
| 8 | 337 | BiOS L/XL Cassette [17 Shelves 86.1 mm Max. Labware Height] | 36356-936 | 203.00 | 68,411.00 |
| 9 | 64 | BiOS L/XL Cassette [27 Shelves - 51.4 mm Max. Labware Height] | 36356-590 | 231.00 | 14,784.00 |

**Subtotal for Cassettes**      124,810.00

### Engineering & Services

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|---|---|---|---|---|---|
| 10 | 1 | BiOS XL Project Engineering | HST41053 | 60,000.00 | 60,000.00 |
| 11 | 1 | Site Survey<br>*Required review of customer's intended installation location* | HST14783 | 3,400.00 | 3,400.00 |
| 12 | 1 | BiOS Site Acceptance Test (5 days)<br>*Based on Hamilton Storage FAT/SAT test document.* | HST41286 | 12,750.00 | 12,750.00 |
| 13 | 1 | Remote API Integration Support<br>*IT support for customer integration project for BiOS system* | HST39547 | 9,000.00 | 9,000.00 |
| 14 | 1 | BiOS Factory Acceptance Test (3 days)<br>*Optional: Customer travels to Franklin, MA for multiple day factory acceptance test. All travel expenses are the customer's responsibility.* | HST43089 | 24,500.00 | 24,500.00 |

**Subtotal for Engineering & Services**      109,650.00

### Installation & Training

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|---|---|---|---|---|---|
| 15 | 1 | BiOS XL Installation and Commissioning - Base System | HST43080 | 117,100.00 | 117,100.00 |
| 16 | 2 | BiOS XL Installation and Commissioning - Per Freezer | HST43081 | 11,625.00 | 23,250.00 |
| 17 | 1 | BiOS End User Training Onsite (3 days) | HST41287 | 7,650.00 | 7,650.00 |

**Subtotal for Installation & Training**      148,000.00

### RackWare

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|---|---|---|---|---|---|
| 18 | 9501 | RackWare HDR-048-02<br>*High-density rack in honeycomb pattern for 48 tubes.* | 831461 | 16.00 | 152,016.00 |


STORAGE

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|------|------|---------|----------|------------------|-------------|
| 19 | 756 | RackWare HDR-060-01<br>*High-density rack for 60 tubes.* | 831462 | 16.00 | 12,096.00 |

Subtotal for RackWare

164,112.00

Total BIOS XL4

2,201,058.00



**Options**
**BiOS XL4 for 500,000 tubes**

### Optional

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|------|------|---------|----------|------------------|-------------|

#### Service Agreement - Gold (additional options available)

| Pos. | Qty. | Product | Part-No. | Unit Price (USD) | Total (USD) |
|------|------|---------|----------|------------------|-------------|
| 1 | 1 | BiOS XL - Gold Service Contract - Base System (per year) | HST41297 | 62,385.00 | 62,385.00 |
| 2 | 2 | BiOS XL- Gold Service Contract - Per Storage Freezer (per year) | HST41298 | 19,607.00 | 39,214.00 |



**HAMILT☺N**
STORAGE

Quotation Nr.: 575 / XL4 / 500K / 4
BiOS XL4 for 500,000 tubes

## Project Summary

| Pos. | Qty. | Product | Total |
|------|------|---------|-------|
| 1 | 1 | BiOS XL4 | |
| | | Instrument | 1,654,486.00 USD |
| | | Cassettes | 124,810.00 USD |
| | | Engineering & Services | 109,650.00 USD |
| | | Installation & Training | 148,000.00 USD |
| | | RackWare | 164,112.00 USD |
| | | Total BiOS XL4 | 2,201,058.00 USD |

| | |
|---|---|
| List Price | **2,201,058.00 USD** |
| Discount (25%) | 550,268.88 USD |
| Special Price | **1,650,789.12 USD** |

**HAMILT☺N**
STORAGE

## Option summary

| Pos. | Qty. | Product | Total |
|------|------|---------|-------|
| 2 | 1 | **Optional** | |
| | | Service Agreement - Gold (additional options available) | 101,599.00 USD |
| | | **Total Optional** | 101,599.00 USD |

Total Options                                         101,599.00 USD



STORAGE

Terms & Conditions

| | |
|---|---|
| **Prices:** | In USD, excluding state and local taxes |
| **Payment terms:** | Payments due Net 60 days from date of invoice<br>Milestone schedule<br>25% upon order<br>25% upon shipment<br>30% on installation complete<br>20% upon acceptance |
| **Terms of delivery:** | DDP Prepaid & Add. Incoterms 2020 |
| **Delivery:** | 9 – 12 months from date of order |
| **Warranty:** | 12 months from date of SAT |
| **Quotation validity:** | Purchase order must be received by May 7th 2021 5:00 pm eastern time. |

Please fax orders to: +1 508-544-7001

Or, email to:  orders.hst.us@hamilton-storage.com

**In order to stay on schedule for the project, Labware (cassettes and rackware) must be finalized within four weeks of receipt of purchase order.**

**For further questions, please contact:**
Lisa Simmons
Regional Sales Manager, West
Hamilton Storage
Email: lsimmons@hamilton-storage.com
Phone: 510-329-1998

| Project Name: Viracor Eurofins BiOS XL4 Proposal | 2020-03-19 | Page 1 of 2 |
| --- | --- | --- |
| Doc. Title: Appendix A: Viracor Cassette Budgeting | | |

# Appendix A: Viracor Cassette Budget



BiOS M7

→ # Storage Bays

→ System Size

| Standard Size Options | | |
| --- | --- | --- |
| System Size: | M, L, or XL | |
| Storage Bays: | BiOS M | 2–10 (Increments of 1) |
| | BiOS L | 2–10 (Increments of 1) |
| | BiOS XL | 4–20 (Increments of 2) |

As proposed to Viracor, a BiOS XL4 would consist of the following:

- 4x -80°C Storage Bays Total
- 612x Storage Cassettes Total (153 per Storage Bay)

Storage Cassette are selected based on labware height. A system can be filled with cassettes chosen to maximum system capacity, or labware flexibility.

As labware is currently undefined, we would recommend budgeting between $124k - $142k for a full complement of storage cassettes. This range is based on the labware types currently under consideration, and shown in the table below:

| Labware Type | Rack[1] | Cassette Description | Price per Cassette | Capacity per Bay[2] |
| --- | --- | --- | --- | --- |
| Nunc 1.8mL [PN 374500] | HDR-060-01 | BiOS L/XL Cassette [27 Shelves - 53.7 mm Max. Labware Height] | $231 | 247,860 |
| Nunc 1.8mL - External Thread [PN 347627] | HDR-048-02 | BiOS L/XL Cassette [27 Shelves - 51.4 mm Max. Labware Height] | $231 | 198,288 |
| Nunc 1.8mL - Internal Thread [PN 1438013] | HDR-048-02 | BiOS L/XL Cassette [27 Shelves - 51.4 mm Max. Labware Height] | $231 | 198,288 |
| Sarstedt 5mL [PN 55.525] | HDR-048-02 | BiOS L/XL Cassette [17 Shelves - 86.1 mm Max. Labware Height] | $203 | 124,848 |
| Fisherbrand Tube w/Sarstedt Insert [PN 02-681-343] | HDR-048-02 | BiOS L/XL Cassette [17 Shelves - 86.1 mm Max. Labware Height] | $203 | 124,848 |
| Simport 5mL [PN 22-045-550 (T501-5T)] | HDR-048-02 | BiOS L/XL Cassette [16 Shelves - 91.9 mm Max. Labware Height] | $203 | 117,504 |

Example: Nunc 1.8mL [PN 374500] has 60 tubes in one rack. One cassette has 27 shelves. 60 times 27 = 1,620 tubes per cassette. 1,620 tubes per cassette x 153 cassettes = 247,860 tubes per storage bay.

[1] Hamilton Storage RackWare HDR Racks are shown for reference only. SBS-format racks from the manufacturers are also compatible, though capacity will vary as a result

[2] "Capacity per Bay" is shown based on an entire storage bay assigned to the listed labware and cassette type. Each storage bay may be filled with multiple different cassettes and labware types.

When ordering cassettes, please be aware of the following:

- Cassettes are user-reconfigurable, and may be swapped at any time. Reconfiguring cassettes can be performed outside of the system.
- Cassettes included with the initial system installation must be defined by the "Design Freeze" milestone, typically 4 weeks after receipt of a Purchase Order.
- Prices shown are based on a full 612 cassettes, included as part of the original purchase.
- Minimum increments and order quantities for each type may apply, and pricing may vary as a result.

# Pricing Indication

Cassettes and RackWare budgeting worksheet.

| Labware Type | Tubes/ Rack | Cassette Shelf Height | Tubes/ Cassette | Requested total capacity tubes | Number of cassettes required Rounded up | Price per Cassette | Cassette budget | RackWare Quantity |
|---|---|---|---|---|---|---|---|---|
| Nunc 1.8mL [PN 374500] | 60 | 27 | 1,620 | 45,360 | 28 | | | 756 |
| Nunc 1.8mL - External Thread [PN 347627] | 48 | 27 | 1,296 | 23,328 | 18 | $231.00 | 64* 231 = $14,784.00 | 972 |
| Nunc 1.8mL - Internal Thread [PN 1438013] | 48 | 27 | 1,296 | 23,238 | 18 | | | |
| Sarstedt 5mL [PN 55.525] | 48 | 17 | 818 | 252,144 | 309 | | | |
| Fisherbrand Tube w/Sarstedt Insert [PN 02-681-343] | 48 | 17 | 816 | 22,848 | 28 | $203.00 | 512*203= $103,936 | 8,529 |
| Simport 5mL [PN 22-045-550 (T501-5T)] | 48 | 16 | 768 | 134,400 | 175 | | | |
| None | Empty Cassettes for the I/O buffer and insulation cassette positions | | | 0 | 30 | $203.00 | $6,090.00 | 0 |
| Total | | | | 501,408 | 606 | | $124,810.00 | 10,257 |

CONFIDENTIAL



GENERAL TERMS AND CONDITIONS OF SALE FOR CAPITAL PURCHASE

## 1    APPLICABILITY

1.1  These terms and conditions of sale ("Terms") are the only terms which govern the sale of the product and services ("Goods") by Hamilton Storage Technologies, Inc. ("HST") a Nevada corporation, and the purchaser of Goods ("Customer"). Notwithstanding anything herein to the contrary, if a written contract signed by both parties is in existence covering the sale of the Goods covered hereby, the terms and conditions of said contract shall prevail to the extent they are inconsistent with these Terms.

1.2  These Terms are applicable to all transactions ("Purchase Agreement") between Customer and HST, including those which represent the implementation of any standard or specialized solution utilizing the Goods for throughput, assay, or other clinical or laboratory function ("HST Solution"). A HST Solution is not a specific part number, but rather is a process utilizing the Goods. As such, specific parts listed within the quotation may require substitution, addition, or subtraction of specified parts. Customer hereby acknowledges and agree that HST has the authority to make such changes to the line items within the quotation and the Purchase Agreement necessary to implement the HST Solution, provided that such changes do not materially diminish the performance, quality or utility of the HST Solution.

1.3  In order to meet the needs of State and County tax laws for products and services, it is necessary to place purchase orders ("Purchase Orders") with HST with a single price and associated reference to a specific quotation to which such price relates, or by line item as they appear in the final quotation. Tax will be determined and set out within the invoice for the Goods.

## 2    QUOTATIONS

Quotations shall only be binding if they contain a stated period of validity and upon approval of credit application per consent from the HST finance department.

## 3    DELIVERY

3.1  The estimated delivery time of Goods will be stated in each quotation and will be dependent upon multiple factors such as current resource workload, third-party item delivery times, hardware creation times and software application development time. The delivery time starts with the date of HST order acknowledgment and ends when the shipment is ready for dispatch or a site acceptance test if required, as stated within the applicable quotation. HST will use all means necessary to deliver product as mutually agreed to, and will keep the Customer informed of possible delays if applicable. Compliance with the delivery time is conditional upon the Customer fulfilling their Purchase Agreement contractual obligations, e.g. notification of all essential technical specifications, availability of samples, import permits, down payments, letters of credit etc.

3.2  The delivery time is reasonably extended if one of the cases applies:

3.2.1  The information required by HST for performance of the Purchase Agreement is not received in time, or if the customer subsequently changes a Purchase Agreement thereby causing a delivery delay of the Goods. All changes requested by the customer require a revised Purchase Order from the customer.

3.2.2  Hindrances occur which prevent HST from performing a Purchase Agreement by force majeure. Hindrances include epidemics, mobilization, war, revolution, serious breakdowns in the works, accidents, labor conflicts, late or deficient delivery by subcontractors of raw materials, semi-finished or finished products, official actions or omissions by any state authorities or public bodies, and natural catastrophes. If the Customer claims damages for delayed delivery, it must be proven that the delay was caused through HST's fault and that the Customer has suffered a loss as a result of such delay. If substitute material can be supplied to accommodate the Customer, the latter is not entitled to claim any delay damages. Any delayed delivery does not entitle the Customer to any rights and claims other than those expressly stipulated herein.

## 4    SHIPPING TERMS, TITLE & RISK OF LOSS

4.1  Delivery shall be made per the quote using Incoterms 2020. Title and risk of loss pass to Customer upon delivery of the Goods to the common carrier.

4.2  Costs associated with shipping and delivery ("Freight ") shall be charged to Customer at the rates negotiated and set forth pursuant to the Purchase Order and invoice, with the invoice to govern any discrepancy between the two.

4.3  When assistance from third-party riggers is required to assist with placement of Goods, the expense will be added to the Freight charges. Disposal of all packaging and packing materials is the Customer's responsibility.

## 5    ACCEPTANCE

Unless otherwise agreed upon in writing, acceptance shall be affected immediately after installation at the Customer's premises. In addition, acceptance shall also be deemed completed when: (i) HST has satisfied its standard installation qualification to show performance to manufacturer's specification or exceptional conditions agreed upon in writing with the Customer prior to acknowledgment of the Purchase Order by HST; or (ii) as soon as the customer uses the Goods in a non- acceptance test mode. If the Customer delays acceptance, the outstanding amounts are due thirty (30) days after delivery.

## 6    INSPECTION & REJECTION OF NONCONFORMING GOODS

6.1  Customer shall inspect the packaging the Goods arrive in and if there is visible damage, they shall report this immediately to the freight carrier as well as HST.

6.2  Customer shall inspect the Goods within ten (10) business days after installation ("Inspection Period"). Customer will be deemed to have inspected the Goods unless it notifies HST in writing of any Nonconforming Goods during the Inspection Period and furnishes such written evidence or other documentation as required by HST. In no event shall any period of time greater than thirty (30) calendar days be considered a "reasonable period" as set forth above. "Nonconforming Goods" means only the following: (i) product shipped is different than identified in Customer's Purchase Order; or (ii) product's label or packaging incorrectly identifies its contents.

6.3  If Customer timely notifies HST of any Nonconforming Goods, HST shall, in its sole discretion, (i) replace such Nonconforming Goods with conforming Goods, or (ii) credit or refund the purchase price for such Nonconforming Goods, together with any reasonable shipping and handling expenses incurred by Customer in connection therewith. Customer shall ship, at its expense and risk of loss, the Nonconforming Goods, in their original packaging, to HST's facility located at 3 Forge Pkwy, Franklin, MA 02038. If HST exercises its option to replace Nonconforming Goods, HST shall, after receiving Customer's shipment of Nonconforming Goods, ship to Customer, at HST's expense and risk of loss, the replaced Goods to the Customer at their location.

6.4  Customer acknowledges and agrees that the remedies set forth in Section 6.2 are Customer's exclusive remedies for the delivery of Nonconforming Goods.

## 7    SECURITY INTEREST

In order to secure payment for the Goods and as collateral security for the payment of the purchase price of the Goods and any other current or future obligations of the Customer to HST, Customer hereby grants to HST a lien on and security interest in and to all of the right, title and interest of Customer in, to and under the Goods, wherever located, and whether now existing or hereafter arising or acquired from time to time, and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. The security interest granted under this provision constitutes a purchase money security interest under the Uniform Commercial Code. This security interest will terminate only on the discharge in



full of all the payment obligations for purchase of the Goods and all such other obligations of Customer to HST.

## 8   AMENDMENT & MODIFICATION

These Terms may only be amended or modified in a writing which specifically states that it amends these Terms and is signed by an authorized representative of each party.

## 9   TAXES & FEES

Customer will pay, when due, all taxes, including sales, use, privilege, excise, personal property, value-added, and other taxes, but not federal or state income or franchise taxes imposed on HST, and all other governmental charges, assessments, fees and any related interest or penalties imposed with respect to the Goods or the transactions contemplated by a Purchase Agreement. If Customer fails to pay any such amount when due, HST may elect to pay it and Customer will promptly reimburse HST for such payment, together with interest from the date paid at the Short Term Quarterly Applicable Federal Rate. If HST is required to obtain any local permit or license to enable it to install the Goods or perform any services for Customer, Customer shall reimburse HST for such related fees and charges.

## 10   PAYMENT TERMS

10.1 *Standard Payment Terms* - Customer shall pay all invoiced amounts due to HST NET 30 days from the date after receipt of HST's invoice. Customer shall make all payments hereunder in US dollars unless otherwise agreed to in writing.

10.2 *Late Payment* – Customer shall pay interest on all late payments at the lesser of the rate of two percent 2% per month or the highest rate permissible under applicable law, calculated daily and compounded monthly. Customer shall reimburse HST for all costs incurred in collecting any late payments, including, without limitation, attorney fees and costs. In addition to all other remedies available under these Terms or at law (which HST does not waive by the exercise of any rights hereunder), HST shall be entitled to suspend the delivery of any Goods if Customer fails to pay any amounts when due hereunder and such failure continues for five (5) business days following written notice thereof.

10.3 *Section is Intentionally Left Blank.*

10.4 *Payment Under Protest* – Should an invoiced payment be disputed by the Customer.

10.5 Customer shall have the opportunity to pay the dispute in full under protest in order to avoid the application of penalties and interest as set out above in Section 6 above. Should the dispute be determined and resolved in favor of the Customer, Customer shall be entitled to reimbursement of the disputed amount, including interest computed at the rate set forth above. Where the dispute is resolved in Customer's favor, accrued interest shall inure to the Customer from the time of payment under protest to the final determination on the invoice is made. Where the dispute is resolved in favor of HST, accrued interest shall inure to HST from the date that payment was due until resolution of the dispute, and the Customer shall be liable for all such amounts.

## 11   CUSTOMER RETURNED CONFORMING GOODS

If a Customer decides to return conforming Goods, a 25% restocking fee will be charged to the Customer with the assumption that the original packaging is intact and used or optional custom approved packaging is used to return the product to HST. If the original packaging or custom approved packaging is not utilized, HST has the right not to issue credit for the unit until a damage assessment is completed. No credit will be given on returned non- inventoried / nonstandard products, third party equipment or other non-recoverable costs such as method development, training, project management, or application support. No fees will be charged for the return of Nonconforming Goods under Section 6.

## 12   LIMITED WARRANTY

12.1 The warranty period is twelve (12) months from the install ("Installation Date"). The Installation Date shall be that date on which the Goods are installed and installation qualification to show performance to manufacturer's specification has been met, as set forth in Section 5.1 above. The warranty period begins on the first day after acceptance. If installation or acceptance is delayed due to reasons beyond the control of HST, the warranty period shall end not later than eighteen (18) months after shipment of the Goods from HST. Upon written request from the Customer, HST shall quickly repair or replace, at its option, all parts which become defective or unserviceable if determined to be due to bad material, faulty design or poor workmanship. All returned parts which are replaced shall become the property of HST. HST is responsible only for the cost of repair or replacement of defective parts. The warranty expressly does not cover consumable parts, damage caused by normal wear, faulty maintenance performed by a third party, failure to observe the operating instructions, and installation not carried out by HST as well as due to other reasons for which HST is not responsible. HST MAKES NO WARRANTY  WHATSOEVER WITH RESPECT TO THE GOODS, INCLUDING BUT NOT LIMITED TO ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; OR (c) WARRANTY OF TITLE WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE.

12.2 Products manufactured by a third party ("Third Party Product") may constitute, contain, be contained in, incorporated into, attached to or packaged together with, the Goods. Third Party Products are limited to the warranty offered by their manufacturer and are not covered by the warranty in Section 12. If HST supplies such Third Party Products to Customer, HST shall inform Customer of those Third Party Products and provide copies of, or access to, all warranties for such Third Party Products. HST does imply, extend or enhance the third party vendor warranty terms.

12.3 For the avoidance of doubt, HST MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO ANY THIRD PARTY PRODUCT, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY: WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE.

12.4 HST shall not be liable for a breach of the warranty set forth in Section 12 if: (i) Customer makes any further use of such Goods after giving such notice of breach; (ii) the defect arises because Customer failed to follow HST's oral or written instructions as to the storage, installation, commissioning, use or maintenance of the Goods; or (iii) Customer alters or repairs such Goods without the prior written consent of HST.

12.5 THE REMEDIES SET FORTH IN SECTION 12 SHALL BE THE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY AND HST'S ENTIRE LIABILITY FOR ANY BREACH OF THE LIMITED WARRANTY SET FORTH IN SECTION 12.1

## 13   TECHNICAL DATA & DOCUMENTS

Technical documents such as drawings, descriptions, illustrations, and data on dimensions, performance and weight are for information purposes only and shall not imply any warranties. HST reserves the right to make any necessary changes. All technical documentation and technical data remain the property of

HST and may neither be used for production purposes nor be made available to third parties.

## 14   LIMITATION OF LIABILITY


**HAMILT<span>⊕</span>N**
STORAGE

14.1 IN NO EVENT SHALL HST BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THESE TERMS, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED IN ADVANCE BY CUSTOMER OR COULD HAVE BEEN REASONABLY FORESEEN BY CUSTOMER, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.IN NO EVENT SHALL HST'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO A PURCHASE AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID TO HST FOR THE GOODS SOLD IN THE PURCHASE AGREEMENT.

14.2 The limitation of liability set forth in Section 14.1 above shall not apply to (i) liability resulting from HST's gross negligence or willful misconduct and (ii) death or bodily injury resulting from HST's grossly negligent or willful acts or omissions.

## 15   LICENSE AGREEMENT

The computer software programs remain the property of HST. HST grants to Customer a non-exclusive license to use the proprietary software programs with the equipment specified in the Purchase Agreement and under the Terms specified herein. HST may declare parts of the software programs as "public"and which parts will be free of restrictions. HST is not liable for the functionality of third-party components. HST is not aware of the rights of any third parties that would oppose the utilization purposes of the licensed software programs. HST guarantees the operability of the software programs with the Goods and for the purpose as set forth in the specifications of the Purchase Agreement under normal conditions of operation and that the software programs have been written following the accepted rules of programming. HST shall not be liable for delays, errors or failures in performance due to causes beyond its control or operation by unqualified personnel. HSTs warranty shall be voided immediately if changes in the setup of the Goods, or a change to the Goods, that the licensed software programs are operating takes place without written confirmation of HST. In case of software program defects limiting the usability of the software programs, HST will deliver corrections free-of-charge during the warranty period. After expiry of the warranty period, HST will provide error maintenance and other support only if the Customer agreed upon and entered into a maintenance and service contract. HST will provide the appropriate support during the installation and for the configuration of the software programs if the Customer provides HST access to the hardware and software. After installation, HST will provide education and consulting services according to its current schedule of charges. The Customer will perform backup operations to protect itself from loss of data due to any error conditions.

## 16   RESTRICTIONS

Customer agrees to not use nor authorize any third party to (i) disassemble, reverse engineer, reverse compile, or reverse assemble the Goods and/or software; (ii) separate, extract, or isolate components of the Goods or engage in other unauthorized analysis of the Goods and/or software; (iii) gain access to or determine the methods of operation of the Goods; or (iv) attempt to reconstruct or discover source code, or underlying ideas or algorithms of the software.

## 17   PATENTS

HST represents and warrants to Customer that the manufacture, use or sale of the Goods do not infringe on any patent, trademark or other intellectual property of any third party. HST agrees to indemnify and hold Customer harmless from all lawsuits, judgments, claims, costs, and expenses, including but not limited to reasonable attorney and accountant fees arising in connection with any third party patent infringement claim that have been pre-approved in writing by HST. Customer shall promptly, within ten (10) business days, notify and inform HST of any claimed patent infringement claim that has been made against it relating to HST products. If the standard products sold under the present conditions are produced or modified according to Customer's specifications, Customer agrees to indemnify and hold HST harmless from all lawsuits, judgments, claims, costs and expenses, including but not limited to attorney's and accountant's fees arising in connection with patent infringement involving Customer's modifications.

## 18   COMPLIANCE WITH LAW

Customer shall comply with all applicable laws, regulations and ordinances. Customer shall maintain in effect all the licenses, permissions, authorizations, consents and permits that it needs to carry out its obligations under a Purchase Agreement.

## 19   TERMINATION

In addition to any remedies that may be provided under these Terms, HST may terminate a Purchase Agreement with immediate effect upon written notice to Customer, if Customer: (i) fails to pay any amount when due under a Purchase Agreement and such failure continues for five (5) business days after Customer's receipt of written notice of nonpayment; (ii) has not otherwise performed or complied with any of these Terms, in whole or in part; or (iii) becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors.

## 20   WAIVER

No waiver by HST of any of the provisions of these Terms is effective unless explicitly set forth in writing and signed by HST. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from these Terms operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

## 21   ATTORNEY FEES

Should either party hereto, or any heir, personal representative, successor or assign of either party hereto, resort to litigation to enforce a Purchase Agreement, other than as expressly set forth in Section 16 above relating to third-party patent infringement claims, the parties shall be responsible for their own attorney's and accountant's fees associated with the costs of litigation, and in no event shall the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its or their reasonable attorneys' fees and costs in such litigation from the party against whom enforcement was sought.

## 22   CONFIDENTIAL INFORMATION

All non-public, confidential or proprietary information of HST, including but not limited to specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, pricing, discounts or rebates, disclosed by HST to Customer, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with a Purchase Agreement is confidential, solely for the use of performing the Purchase Agreement and may not be disclosed or copied unless authorized in advance by HST in writing. Upon HST's request, Customer shall promptly return all documents and other materials received from HST. HST shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Customer at the time of disclosure; or (c) rightfully obtained by Customer on a non-confidential basis from a third party.

**HAMILTON**
STORAGE

## 23  FORCE MAJEURE

HST shall not be liable or responsible to Customer, nor be deemed to have defaulted or breached a Purchase Agreement, for any failure or delay in fulfilling or performing any term of a Purchase Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of HST including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest, national emergency, revolution, insurrection, epidemic, lock-outs, strikes or other labor disputes (whether or not relating to either party's workforce), or restraints or delays affecting carriers or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunication breakdown or power outage.

## 24  ASSIGNMENT

24.1  HST may assign any of its rights or delegate any of its obligations under a Purchase Agreement without the prior written consent of Customer.

24.2  Customer shall not assign any of its rights or delegate any of its obligations under a Purchase Agreement without the prior written consent of HST. Any purported assignment or delegation in violation of this Section is null and void. No assignment or delegation relieves Customer of any of its obligations under a Purchase Agreement.

## 25  RELATIONSHIP OF THE PARTIES

The relationship between the parties is that of independent contractors. Nothing contained in a Purchase Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

## 26  NO THIRD-PARTY BENEFICIARIES

A Purchase Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of these Terms.

## 27  GOVERNING LAW

All matters arising out of or relating to a Purchase Agreement are governed by and construed in accordance with the internal laws of the State of Massachusetts without giving effect to any choice or conflict of law provision or rule (whether of the State of Massachusetts or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than those of the State of Massachusetts.

## 28  SUBMISSION TO JURISDICTION

Any legal suit, action or proceeding arising out of or relating to a Purchase Agreement shall be instituted in the federal courts of the United States of America or the courts of the State of Massachusetts, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

## 29  NOTICES

All notices, requests, consents, claims, demands, waivers and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the sales confirmation, invoice, or purchase order, or to such other address that may be designated by the receiving party in writing. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in a Purchase Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

## 30  SEVERABILITY

If any term or provision of a Purchase Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of a Purchase Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

## 31  SURVIVAL

Provisions of these Terms which by their nature should apply beyond their term will remain in force after any termination or expiration of a Purchase Agreement including, but not limited to, the following provisions: Section 18.1 Compliance with Law, Section 22.1 Confidential Information, Section 27.1 Governing Law, Section 28.1 Submission to Jurisdiction and Section 31.1 Survival.

## 32  REPRESENTATION OF AUTHORITY

Each person signing a Purchase Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver a Purchase Agreement. Each party represents and warrants to the other that the execution and delivery of the agreement and the performance of such party's obligations hereunder have been duly authorized and that the Purchase Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

## 33  HEADINGS

The headings in these Terms are included for convenience only and shall neither affect the construction or interpretation of any provision in a Purchase Agreement nor affect any of the rights or obligations of the parties to the agreement.

## 34  AMBIGUITIES

Each party has participated fully in the review and revision of a Purchase Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in interpreting the agreement. The language in the agreement shall be interpreted as to its fair meaning and not strictly for or against any party.

## 35  ENTIRE AGREEMENT

These Terms contain the entire understanding and agreement between the parties hereto with respect to its subject matter and supersedes any prior or contemporaneous written or oral agreements, representations or warranties between them respecting the subject matter hereof.

# BiOS_XL4_Proposal_20210416_v4_04.26.21

Final Audit Report

2021-05-12

| | |
|---|---|
| Created: | 2021-05-12 |
| By: | Shannon Basinski (shannonbasinski@eurofins-viracor.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA-q_pcCbFTiTqcBEV8dhRv1RjwT7BUw7A |

## "BiOS_XL4_Proposal_20210416_v4_04.26.21" History

🖰 Document created by Shannon Basinski (shannonbasinski@eurofins-viracor.com)
2021-05-12 - 6:21:03 PM GMT- IP address: 76.79.42.138

🖃 Document emailed to Scott Mattivi (scottmattivi@eurofins-viracor.com) for signature
2021-05-12 - 6:22:37 PM GMT

🖰 Email viewed by Scott Mattivi (scottmattivi@eurofins-viracor.com)
2021-05-12 - 6:22:59 PM GMT- IP address: 76.79.42.138

🖰 Scott Mattivi (scottmattivi@eurofins-viracor.com) verified identity with Adobe Sign authentication
2021-05-12 - 6:24:01 PM GMT

🖰 Document e-signed by Scott Mattivi (scottmattivi@eurofins-viracor.com)
Signature Date: 2021-05-12 - 6:24:01 PM GMT - Time Source: server- IP address: 76.79.42.138

🖰 Agreement completed.
2021-05-12 - 6:24:01 PM GMT

**HAMILT⊕N**
STORAGE

So Accepted:

Hamilton Storage Technologies, Inc.

Customer:
Eurofins Viracor
BioPharma Services

By: _____

~~Matthew Hamilton~~ John Genereux
~~President~~  V P / G·M
Name and Title

Date: 13 MAY 2021

By: _Scott Mattivi_ _____

Scott Mattivi          President
Name and Title

Date: 12-May-2021

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EUROFINS VIRACOR                        :
BIOPHARMA SERVICES, LLC,                :     C.A. No. 2025-1059-NAC
                          Plaintiff,    :
                                        :
            v.                          :
                                        :
HAMILTON STORAGE                        :
TECHNOLOGIES, INC.,                     :
                                        :
                          Defendant.    :

## AFFIDAVIT OF NON-RESIDENT SERVICE ON DEFENDANT HAMILTON STORAGE TECHNOLOGIES, INC.

STATE OF DELAWARE                )
COUNTY OF NEW CASTLE             )

I, Leslie B. Spoltore, Esquire, do depose and say:

1.  I am an attorney with the law firm of Obermayer Rebmann Maxwell & Hippel LLP and counsel to Plaintiff Eurofins Viracor BioPharma Services, LLC ("Eurofins").

2.  On September 24, 2025, I caused the Summons and Verified Complaint to be served on Defendant, Hamilton Storage Technologies, Inc. ("Hamilton"), through its Registered Agent 3H Agent Services, Inc. ("3H Agent") at 320 North Carson Street, Carson City, Nevada 89701. Service was provided via Federal Express (tracking number 884633267384), adult signature required.

3.  3H Agent signed for receipt of the Federal Express and received the Summons and Verified Complaint on September 25, 2025, constituting notice to Defendant. A copy of the proof of delivery from Federal Express is attached as Exhibit A.

Obermayer Rebmann Maxell & Hippel LLP

_____
Leslie B. Spoltore, Esq. (DE ID #3605)
123 S. Justison Street, Suite 100
Wilmington, DE 19801
302.238.6947

Date: September 30, 2025

SWORN TO AND SUBSCRIBED before me this 30th day of September, 2025.

_____
Notary Public

MICHELLE JANE ABRAHAM
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires September 29, 2026

# EXHIBIT A

September 29, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 884633267384

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Shipping/Receiving |
| Signed for by: | M.Rhodes | Delivery Location: | |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday;<br>Direct Signature Required | | CARSON CITY, NV, |
| | | Delivery date: | Sep 25, 2025 14:08 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 884633267384 | Ship Date: | Sep 24, 2025 |
| | | Weight: | 1.0 LB/0.45 KG |
| Recipient: | | Shipper: | |
| CARSON CITY, NV, US, | | WILMINGTON, DE, US, | |
| Reference | 043591.0002 | | |

FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment.  Please check again later for a signature.